The UNIVERSITY OF NOTRE DAME
DU LAC, Appellant,

v.

J.C. GOURMET FOOD IMPORTS
CO., INC., Appellee.

Appeal No. 82–588.
Opposition No. 61847.

United States Court of Appeals,
Federal Circuit.

March 30, 1983.

Samuel Lebowitz, Washington, D.C., submitted for appellee.

Before NICHOLS, KASHIWA and NIES, Circuit Judges.

NIES, Circuit Judge.

This appeal is from the decision of the United States Patent and Trademark Office Trademark Trial and Appeal Board (board) dismissing an opposition to registration of the trademark NOTRE DAME and Design for cheese, application serial No. 11,737, filed January 7, 1977.[1] The board held that the mark sought to be registered was not precluded from registration under either 15 U.S.C. § 1052(a) or § 1052(d), as asserted by appellant. We affirm.

### Background

J.C. Gourmet Food Imports, Co., Inc., is in the business of importing European cheeses to the United States and selling them through food brokers, distributors, supermarket chains, fancy gourmet shops, and similar outlets. The record establishes that the mark NOTRE DAME and design has been used by appellee on imported French cheeses since at least 1974. Gourmet seeks a registration on the Principal Register based on this use of the mark.

Appellant is the well-known University located in Indiana. As grounds for opposition, in essence, appellant alleges that because of its prior rights in NOTRE DAME as its name and mark, the trademark NOTRE DAME should be refused registration to Gourmet under 15 U.S.C. § 1052(a) because Gourmet's mark falsely suggests a connection with the University and under 15 U.S.C. § 1052(d) because Gourmet's use of NOTRE DAME is likely to cause confusion as to source.

In addition to establishing that the University is renowned for excellence in scholarship and athletics, the record shows that

Robert E. Clemency, Milwaukee, Wis., argued for appellant.

---

1. The mark is reproduced in the opinion of the board reported at 213 USPQ 594 (TTAB 1982). The design displayed with NOTRE DAME is a representation of the Cathedral of Notre Dame located in Paris.

the University has engaged in the sale of a variety of goods, including clothing, stationery, glassware, jewelry and novelty items on which NOTRE DAME is displayed prominently and that it operates several cafeterias which sell food products. The University relies on common law rights based on continuous use of NOTRE DAME since 1842.[2] Gourmet does not dispute these facts, indeed, specifically admits that appellant enjoys great prestige and goodwill throughout the country.

Appellant seeks review of the decisions of the board on both the 1052(a) and 1052(d) issues.[3] Our jurisdiction is under 28 U.S.C. § 1295, amended by the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 127, 96 Stat. 37.

## Discussion

### I

Recognizing that NOTRE DAME identifies the University, that the University is a famous and distinguished institute of learning, and that NOTRE DAME has been used as a mark by the University on a wide variety of commercial items sold to the public, the board found that the differences between the goods of Gourmet and the goods and services offered by the University were sufficient to preclude a likelihood of confusion within the meaning of § 2(d). We agree.

■ The fame of the University's name is insufficient in itself to establish likelihood of confusion under § 2(d). "Likely ... to cause confusion" means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another. It must also be established that there is a reasonable basis for the public to attribute the particular product or service of another to the source of the goods or services associated with the famous mark. To hold otherwise would result in recognizing a right in gross, which is contrary to principles of trademark law and to the concepts embodied in 15 U.S.C. § 1052(d).

■ The record here is devoid of evidence on which to base a finding of likelihood of confusion as to the source of goods or services. The University has not, for example, attempted to show that it has become known for the development or sponsorship of any food products, or that its name has become identified with any particular food products or with food service operations.

The University asks that we accept as proof of a likelihood of confusion, the opinion of the manager of the Notre Dame bookstore to the effect that the public would be led to believe that the University sponsored appellee's goods. The testimony of someone so closely associated with the University is hardly representative of public reaction to the Gourmet trademark usage.

Nor do we find any evidence of intent to trade upon the goodwill of the University, as discussed more fully, *infra,* intent being pertinent to a determination of likelihood of confusion. *Shoe Corp. of America v. Juvenile Shoe Corp. of America,* 266 F.2d 793, 795, 121 USPQ 510, 512 (CCPA 1959)

We conclude that the board correctly found, on the record here, that Gourmet's registration of NOTRE DAME for cheese was not precluded under 15 U.S.C. § 1052(d).

2. Appellant introduced copies of applications for registrations as collective membership marks of what appears to be the University seal, but no registrations except for the mark ND for various goods are of record.

3. 15 U.S.C. § 1052 (1976) states in pertinent part:

No trademark ... shall be refused registration unless it—
(a) consists of or comprises ... matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute;

\* \* \* \* \* \*

(d) consists of or comprises a mark which so resembles ... a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion, or to cause mistake, or to deceive .....

## II

■ The University claims, as an alternative ground for its opposition, that Gourmet's mark falsely suggests a connection with an institution and, therefore, is unregistrable under § 2(a) of the Lanham Act (15 U.S.C. § 1052(a)). In dismissing this claim, the board stated:

In order to prevail under § 2(a) an opposer must show a § 2(d) situation plus an intent, implied or actual, on the part of applicant to trade on the goodwill possessed by opposer in the mark.

The University characterizes the board's standard under § 2(a) as an inappropriate "goods" test. It then argues that institutions may not be associated with any goods and that the board's interpretation is incompatible, therefore, with the intent of the statute. Moreover, to construe the statutory language of § 2(a), "may falsely suggest a connection," to mean the same as the "likely . . . to cause confusion" language of § 2(d), would, it is argued, render § 2(a) surplusage. Finally, the University asserts that the additional requirement of "intent" is unjustified in view of the complete absence of such language from § 2(a).

The analysis of § 2(a) stated by the board began appearing in its decisions following the decision in *Morehouse Manufacturing Corp. v. J. Strickland & Co.*, 407 F.2d 881, 160 USPQ 715 (CCPA 1969).[4] In *Morehouse,* the Court of Customs and Patent Appeals[5] had before it a question of the right of a party to register a trademark used for hair products over the objection of a prior user of a similar mark for the same type of goods. Appellant in that case had asserted both § 2(a) and § 2(d), as does the University here, as bases for sustaining the opposition. After dismissing the opposition under § 2(d), the board had held that § 2(a) was not available to a commercial corpora-

tion. The court affirmed but held that § 2(a) was applicable to such an entity in view of the statutory definition of "person" in § 45 (15 U.S.C. § 1127), and concluded:

But this avails appellant nothing on this point because we do not agree with the further argument that "Blue Magic" does "falsely suggest a connection with" appellant. To do this there would have to exist, at the very least, the same likelihood of confusion with appellant's "MAGIC" marks, under § 2(d), which appellant contends for under its final point. We can, therefore, discuss these two questions together.

It was not necessary in *Morehouse* to define the § 2(a) test with greater precision as there was no basis for finding a "false connection" except upon a finding of likelihood of confusion of source arising from the similarity of the respective marks and goods.

Appellant argues that the *Morehouse* conclusion, to the extent that it equates § 2(a) and § 2(d), must be held to apply only to "commercial persons," not to non-commercial institutions which are specifically protected by § 2(a). With respect to institutions, appellant urges that the proof with respect to a false suggestion or connection should be less stringent than required under § 2(d). We cannot accept appellant's premise.

A reading of the legislative history with respect to what became § 2(a) shows that the drafters were concerned with protecting the name of an individual or institution which was not a technical "trademark" or "trade name" upon which an objection could be made under § 2(d).[6] The *Morehouse* decision has been interpreted as bringing the sections somewhat closer in scope, but the decision, in fact, held no more than that commercial entities were "persons" within the meaning of § 2(a).

---

4. See for example, *Medtronic, Inc. v. Medical Devices, Inc.*, 204 USPQ 317 (TTAB 1979).

5. The holdings of the Court of Customs and Patent Appeals have been adopted as precedent for this court. *South Corp. v. United States*, 690 F.2d 1368, 215 USPQ 657 (Fed.Cir.1982) (*In banc*).

6. Hearings on H.R. 4744 before the Subcomm. on Trade-Marks of the House Comm. on Patents, 76th Cong., 1st Sess. 18 (1939). *See* Appendix. *See also* Derenberg, *The Eighteenth Year of Administration of the Lanham Act of 1946,* 55 Trademark Rep. 609, 626–27 (1965).

In construing § 2(a), we are obliged to consider the statute as a whole and the interrelationship of its various provisions. In this connection, 15 U.S.C. § 1064 (§ 14) is particularly pertinent. Under § 14, a petition to cancel a registration of a mark is precluded after five years, except on limited grounds. Section 14(c) provides:

A petition to cancel a registration of a mark . . . may be filed . . .

\* \* \* \* \* \*

(c) at any time if the . . . registration was obtained fraudulently or contrary to the provisions of section 4 or of subsection (a), (b), or (c) of section 2 of this Act.

Thus, § 2(d) grounds for cancellation, including likelihood of confusion as to source of goods or services, is not permitted after five years. In contrast, a petition for cancellation based on § 2(a) is permissible at any time. Clearly the same standard cannot be adopted for § 2(a) as for § 2(d). To do so would nullify the deliberate omission of § 2(d) from § 14.

In line with this rationale, the board has applied a more stringent test under § 2(a) requiring not only likelihood of confusion of source but also an intent to trade upon the goodwill of a prior user where the basis for the proceeding is prior use of a trademark or trade name. *Medtronics v. Medical Devices, Inc.*, 204 USPQ at 325.[7] We need not decide here whether this interpretation of § 2(a) is correct. To the extent that the University relies upon its prior use of NOTRE DAME for particular goods and services and there is no proof of likelihood of confusion as to the source of Gourmet's goods, under no circumstances could there be a false association.

III

■ With respect to the University's argument that a different standard must be applied under § 2(a), the legislative history does indicate that § 2(a) was intended to preclude registration of a mark which conflicted with another's rights, even though not founded on the familiar test of likelihood of confusion.

On the other hand, a name cannot be protected in gross under § 2(a) any more than under § 2(d). Thus, if the University is to prevail on a basis not predicated on likelihood of confusion as to source of goods, it is necessary for the University to establish another legally cognizable right with which Gourmet's registration would conflict.

Although not articulated as such, it appears that the drafters sought by § 2(a) to embrace concepts of the right to privacy, an area of the law then in an embryonic state.[8] Our review of case law discloses that the elements of a claim of invasion of one's privacy have emerged as distinctly different from those of trademark or trade name infringement. There may be no likelihood of such confusion as to the source of goods even under a theory of "sponsorship" or "endorsement," and, nevertheless, one's right of privacy, or the related right of publicity, may be violated. *See, e.g., John W. Carson v. Here's Johnny*, 698 F.2d 831 (6th Cir., 1983); *Stone v. Creative Communications, Inc.*, 216 USPQ 261 (D.Ill.1981). It is a right of this nature, a right to control the use of one's identity, which the University also asserts under § 2(a).

■ Under concepts of the protection of one's "identity," in any of the forms which have so far been recognized,[9] the initial and

---

7. The board may be giving "false" the meaning of "intentionally untrue" found in standard dictionaries and case law. *See* Black's Law Dictionary 721 (4th ed. 1979).

8. The prohibition in § 2(c), 15 U.S.C. § 1052(c), which the drafters discussed at the same time and in the same context as 2(a) (*see* Appendix), is also of this nature. For analysis of § 2(c), see opinion of Examiner in Chief Federico in *Reed v. Bakers Eng. & Equip. Co.*, 100 USPQ 196 (1954).

9. For discussion of the four distinct wrongs generally recognized under "right to privacy", and the elements of such claims, *see* Restatement (Second) of Torts § 652A (1976); 1 R. Callmann, The Law of Unfair Competition Trademarks and Monopolies § 1.23 (L. Altman 4th ed. 1981); W. Prosser, Handbook of the Law of Torts 802–18 (4th ed. 1971). *See also*

critical requirement is that the name (or an equivalent thereof) claimed to be appropriated by another must be unmistakably associated with a particular personality or "persona."

As stated by Professor Prosser:

It is in this sense that "appropriation" must be understood. It is therefore not enough that a name which is the same as the plaintiff's is used in a novel, or the title of a corporation, unless the context or the circumstances indicate that the name is that of the plaintiff. [Footnotes omitted.]

W. Prosser, Handbook of the Law of Torts at 805–06 (4th ed. 1971).[10] Thus, to show an invasion of one's "persona," it is not sufficient to show merely prior identification with the name adopted by another. Nor is it sufficient, as urged by the University, that the fame of the name of an institution provides the basis for protection in itself. The mark NOTRE DAME, as used by Gourmet, must point uniquely to the University.

■ As the board noted, "Notre Dame" is not a name solely associated with the University. It serves to identify a famous and sacred religious figure and is used in the names of churches dedicated to Notre Dame, such as the Cathedral of Notre Dame in Paris, France. Thus, it cannot be said that the only "person" which the name possibly identifies is the University and that the mere use of NOTRE DAME by another appropriates its identity. (*See FBI v. Societe M. Bril & Co.,* 187 USPQ 685, 687 (D.D.C.1975), where the court indicates that § 2(a) may preclude registration where "the mark by its very nature falsely suggests a connection.") This conclusion could be changed if the evidence showed that Gourmet intended to identify the University, as the University argues. Evidence of such intent would be highly persuasive that the public will make the intended false association. The defense that the result intended was not achieved would be hollow indeed.

There is no direct evidence here establishing an intent on the part of Gourmet to identify the University. To the contrary, Gourmet's general manager testified that he selected the name while viewing the Cathedral of Notre Dame in Paris, when he was in France on a business trip to purchase cheese, and a representation of this edifice forms part of the mark sought to be registered. The University asks us, nevertheless, to draw an inference of intent to trade on the University's goodwill from what is characterized as "stone walling" by the witness with respect to his knowledge of opposer's use of NOTRE DAME.

The board noted that the witness "refused" to answer certain questions on cross-examination pertaining to his knowledge of the University and certain individuals who have been connected with it.[11] The board ruled, in its final decision, that these questions were proper and should have been answered. Accordingly, the board construed answers unfavorable to Gourmet and presumed that the witness did know of the

---

*Martin Luther King, Jr., Center for Social Change, Inc. v. American Heritage Products, Inc.,* 250 Ga. 135, 296 S.E.2d 697, 216 USPQ 711 (1982). The right to privacy is limited to individuals in some states; *but see Socialist Workers Party v. Attorney Gen. of the United States,* 463 F.Supp. 515, 524–25 (S.D.N.Y. 1978); 1 R. Callmann, The Law of Unfair Competition Trademarks and Monopolies § 1.23 n. 10 (L. Altman 4th ed. 1981). However, this limitation is negated by the language of § 2(a).

**10.** *See also* 1 R. Callmann, The Law of Unfair Competition Trademarks and Monopolies § 1.22 (L. Altman 4th ed. 1981).

**11.** The witness did not "refuse" to answer in the technical sense for which sanctions may be imposed. After the witness had testified that he had never heard of Knute Rockne, Ara Parseghian and Digger Phelps, his counsel objected to further questions on the grounds that the witness' knowledge of such persons was irrelevant and immaterial and instructed the witness not to answer. The expression "failure" or "refusal" to answer is more appropriately used where there is no response following a ruling by the board or a court that the objection was not valid. *See* Rule 37(b), Fed.R.Civ.P., where the term is used in connection with discovery depositions.

University [12] and certain persons associated with it, but did not find that knowledge sufficient to attribute a wrongful intent to Gourmet. We question whether the University was entitled to even as favorable a ruling as the board made and, thus, see no harmful error to the University by this ruling.

### Conclusion

The decision by the board dismissing the subject opposition to registration of NOTRE DAME and Design for cheese is *affirmed.*

AFFIRMED.

### APPENDIX

### TRADE-MARKS

### HEARINGS

Before the Committee on Patents

Subcommittee on Trade-Marks

House of Representatives

Seventy-Sixth Congress

First Session

on

H.R. 4744

March 28, 29, 30, 1939

MR. LANHAM. There are no further suggestions, I take it, with reference to section 1. If not, we will take up section 2. [Reading:]

Marks Registrable on the Principal Register.

SEC. 2. No mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration as a trade-mark on account of its nature unless it—

(a) Consists of or comprises immoral, deceptive, or scandalous matter; or matter which tends to disparage persons, living or dead, institutions, beliefs, or national symbols, or to bring them into contempt;

(b) Consists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof;

(c) Consists of or comprises the name, portrait, or signature of a living individual unless by his written consent;

(d) Consists of or comprises a mark which so resembles a trade-mark previously registered by another under the act of February 20, 1905, as amended, or upon the Principal Register provided by this act, as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive purchasers;

(e) Consists of a mark which, when applied to the goods of the applicant, has merely a descriptive or geographical, and no other, meaning, except as such marks may be registrable under section 4, or is merely the name of an individual and has no other meaning;

(f) Except as expressly excluded in paragraphs (a), (b), (c), and (d) of this section, nothing herein shall prevent the registration of any mark used by the applicant as a trade-mark which has become distinctive of the applicant's goods in commerce.

MR. THOMSON. In subsection (c) before the word "name" insert the word "full." Subsection (c) refers to the name of a living individual. Subsection (e) refers to the name of an individual. I think under subsection (c) where I refer to the full name that the Patent Office will not refuse to register "Thomson for Shoes" because they have not secured my consent. The same language is used showing the name of an individual in subsection (e), and there should be some distinction made.

MR. LANHAM. What suggestion would you make with reference to its modification?

12. In response to an earlier request for admission, Gourmet had admitted that Notre Dame was founded in 1842, was nationally recognized as a leading University, and enjoyed prestige and goodwill throughout the country.

MR. THOMSON. I suggest the insertion of the word "full" before the word "name," making it read "full name."

MR. LANHAM. What is your reaction to that, Mr. Rogers?

MR. ROGERS. I do not see any objection to that at all, Mr. Chairman.

MR. LANHAM. You have no objection to that?

MR. ROGERS. Personally I think it is a good idea, unless there is objection.

MR. LANHAM. Mr. Robertson.

## STATEMENT OF THOMAS E. ROBERT-SON, WASHINGTON, D.C.

MR. ROBERTSON. Thomas E. Robertson, of Washington, D.C. It seems to me, Mr. Chairman, that we have left out something from the present statute which should be included in it. I remember that Senator Glass had a statute passed which provided for the amending of the act of 1920 so as to provide, for example, that a picture of an ex-President of the United States, even though dead, could not be used without the consent of his widow. Now, here this sub-section (c) says: "Consists of or comprises the name, portrait, or signature of a living individual unless by his written consent." I think that should be amended so as to prevent the use of any person's name, portrait, or signature, living or dead.

MR. LANHAM. There would have to be a modification with reference to his consent if he were dead. Somebody else would have to give that.

MR. ROBERTSON. I think we should prohibit it entirely.

MR. LANHAM. Prohibit it entirely?

MR. ROBERTSON. Yes. Why should the Congress of the United States, for example, permit Benjamin Harrison's name, and I am picking out an ex-President so far back so that his widow is dead, why should the Congress of the United States permit Benjamin Harrison's name to be used as a trade-mark on any article, device, or merchandise, even though dead?

MR. MARONEY. In other words, we would not want to have Abraham Lincoln gin.

MR. ROBERTSON. No, sir; we would not.

MR. FENNING. Or George Washington coffee.

MR. ROGERS. There was a good deal of discussion last year about that very thing, and considerable difficulties seem to arise in connection with it which ever way we jump. I quite agree that Abraham Lincoln gin ought not to be used, but I would not say the use of G. Washington on coffee should not be permissible. We attempted to take care of it in subsection (a) of section 2: "Consists of or comprises immoral, deceptive, or scandalous matter; or matter which tends to disparage persons, living or dead, institutions, beliefs, or national symbols, or to bring them into contempt." That would take care of abuses, but it would not prevent the perfectly legitimate use of names.

I would like to make a suggestion, and that is that it seems to me the language in subsection (e) is not altogether happy. There is a practical difficulty that is encountered in the Patent Office, and one which has been encountered in every Patent Office in the world, as far as I know, as to what is a geographical name. The present statute prevents the registration of geographical names as trade-marks. Some people take the position that any name is found somewhere in the Postal Guide, and hence is not a registerable name. For instance, Pink, Red, Fish, Green, Greenfield, Lily Pons, and so forth, are all found in the Postal Guide. They are the names of individuals or persons and shall not be registered. There is somewhere on the earth's surface some person who has any name that you can possibly think of. The result of that is that if literally interpreted that provision in the present act prohibits the registration of nearly any word that anybody can think of. I would suggest that subsection (e) be amended to read this way, and I think it carries out the same idea and, perhaps, makes it a little clearer:

(1) which, when applied to the goods of the applicant, is merely descriptive of them.

(2) when applied to the goods of the applicant, is primarily geographical and descriptive of them, except as such marks may be registrable under section 4 hereof.

(3) is merely and primarily the name of a particular person other than the applicant.

That is to get away from this idea of a surname. Any name can be a surname, such as Cotton, King, Jack, Knife, Ink, and the like, but it is not the name of any particular person.

MR. ROBERTSON. I should like to go back to that same section and read into the record the present statute:

*Provided further,* That no portrait of a living individual may be registered as a trade-mark except by the consent of such individual, evidenced by an instrument in writing, nor may the portrait of any deceased President of the United States be registered during the life of his widow, if any, except by the consent of the widow evidenced in such manner.

That whole phrase has been left out of the proposed law.

MR. LANHAM. That is, the phrase with reference to Presidents?

MR. ROBERTSON. Yes; and it should undoubtedly go in. I feel if it is not put in here that it will be put in over in the Senate.

MR. LANHAM. Is there any objection to its inclusion?

MR. ROGERS. Why limit it to deceased Presidents? There are other people of eminence whose names may be used as trademarks quite legitimately. The only limitation should be that the use of such name should not disparage them or bring them into contempt.

MR. LANHAM. In other words, that is in accordance with the provisions of section (a)?

MR. FENNING. There is another matter which has been dropped out of the statute which may be desirable to include. There is at present an inhibition against the registration of any design or picture that has been or may hereafter be adopted by any fraternal society as its emblem, or of any name, distinguishing mark, character, emblem, colors, flag, or banner adopted by any institution, organization, club, or society which has been incorporated in any State in the United States prior to the date of the adoption and use by the applicant: provided, that said name, distinguishing mark, character, emblem, colors, flag, or banner was adopted and publicly used by said institution, organization, club, or society prior to the date of adoption and use by the applicant. · Many organizations like the New York Athletic Club and many others object to having their insignia put upon athletic goods which are offered for sale. Harvard University, likewise, objects to having beer and liquor sold under the name "Harvard."

MR. LANHAM. That is taken care of in your judgment, Mr. Rogers, by subsection (a) referring to institutions, and so forth?

MR. ROGERS. Yes; I should think so. Moreover, when one considers the number of fraternal societies and organizations which are incorporated in the different States and the variety of names that they have it would be pretty hard to get a name that has not been or is not being used by some fraternal organization, club, or society. Where the prohibition is against immoral, deceptive, or scandalous matter, or matter which tends to disparage persons, living or dead, institutions, beliefs, or national symbols, I should think that would be enough, particularly since institutions like the New York Athletic Club who use such names can register them themselves if they desire to do so under this bill.

MR. LANHAM. If the connotation of the word "institution" is sufficiently comprehensive to include fraternal organizations and these other various groups, it seems to me that the provision in subsection (a) might be sufficient.

MR. ROGERS. Yes; and if there is any doubt about it the word "associations" could be put in there to make it plain.

MR. LANHAM. It seems to me that there might be a little doubt, Mr. Rogers, as to

whether that is sufficiently comprehensive. That prohibits disparaging persons, living or dead, institutions, beliefs, or national symbols.

MR. FENNING. I think there has been no real trouble with the 1905 statute as it stands now, as I understand it. The wording in the statute with respect to insignia has apparently been satisfactory, and it seems to me it might be just as well to carry it over. There may be controversy over what some people call disparagement.

MR. LANHAM. Of course, that is the very thing that subsection (a) was designed to meet.

MR. ROGERS. Yes, sir.

MR. FENNING. There is a good deal of question as to what disparagement is. If excellent athletic goods, for instance, are marketed with the name of the New York Athletic Club on them, that is not detrimental to the club.

MR. LANHAM. Of course, I am not sitting here in a judicial capacity, and I cannot construe that.

MR. ROBERTSON. Mr. Chairman, I have not any hesitation at all in saying that I do not think that section as presently drawn does cover the matter at all. The word "disparage" is too comprehensive in meaning. For instance, it does not cover the use of an ex-President's name, the use of it in a respectful manner on goods on which the family might not desire it used. That is not disparagement at all, but at the same time it does not cover that situation.

### STATEMENT OF LESLIE FRAZER, ASSISTANT COMMISSIONER OF PATENTS

MR. FRAZER. I would like to make this suggestion with respect to the word "disparage." I am afraid that the use of that word in this connection is going to cause a great deal of difficulty in the Patent Office, because, as someone else has suggested, that is a very comprehensive word, and it is always going to be just a matter of the personal opinion of the individual parties as to whether they think it is disparaging. I would like very much to see some other word substituted for that word "disparage."

MR. LANHAM. That seems to me, in the light of administration, to be a very pertinent suggestion, and if you gentlemen can clarify that with verbiage you suggest it would be very helpful.

No further discussion has been noted to explicate insertion of the words "or falsely suggest a connection" in a subsequent bill, H.R. 5461, 77th Cong. 1st Sess. 87 Cong.Rec. 6563 (1941).