THIS OPINION IS
CITABLE AS PRECEDENT OF THE TTAB    June 10, 1997

Hearing:                                        Paper No. 27
April 24, 1996                                  EJS


U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

In re North American Free Trade Association
_____

Serial No. 74/179,335
_____

Robert T. Maguire and Joel Rogers of Ablondi, Foster, Sobin
& Davidow, P.C. for North American Free Trade Association

Vivian Micznik First, Trademark Examining Attorney, Law
Office 104 (Sidney Moskowitz, Managing Attorney)
_____

Before Simms, Seeherman and Hairston, Administrative
Trademark Judges.

Opinion by Seeherman, Administrative Trademark Judge:


North American Free Trade Association, a corporation of

the District of Columbia, applied to register the mark NAFTA

and design, as shown below, for services which were

subsequently amended to "promotion of trade and investment

among the United States, Canada, Mexico and other countries;

providing information and consultation to members regarding

the issues and effects of a free trade area on their investments."[1]



NAFTA

A final refusal was ultimately issued pursuant to Section 2(a) of the Trademark Act, 15 U.S.C. 1052(a), on the ground that applicant's mark consists of or comprises matter which may falsely suggest a connection with the North American Free Trade Agreement, which is known by the acronym NAFTA. In addition, the Examining Attorney has made final a requirement for a disclaimer of exclusive rights to "NAFTA" pursuant to Section 6 of the Trademark Act, 15 U.S.C. 1056, should the mark be determined to be otherwise registrable.

It is from this final refusal and final requirement that applicant has appealed. The case was fully briefed, and an oral hearing was held before the Board.

Section 2(a) prohibits, inter alia, the registration of a mark if it "consists of or comprises...matter which

---

[1] Application Serial No. 74/179,335, filed June 24, 1991, and asserting first use on March 28, 1991 and first use in interstate commerce on May 1, 1991.

may...falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols...."  As the Court explained in **The University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., Inc.**, 703 F.2d 1372, 217 USPQ 505, 508 (Fed. Cir. 1983), Section 2(a) was designed to protect "the name of an individual or institution which was not a technical 'trademark' or 'trade name' upon which an objection could be made under Section 2(d)."  Further, the court stated that Section 2(a) embraces the concepts of the right to privacy and the related right of publicity.  217 USPQ at 509.

This Board, in **In re Cotter & Co.**, 228 USPQ 202, 204 (TTAB 1985), delineated what was required of the Office to support a refusal under the "falsely suggests a connection" clause of Section 2(a):

> ...it is the Examining Attorney's burden to show that the mark sought to be registered is unmistakably associated with a particular "persona."  In order to do this, an Examining Attorney must show that the mark sought to be registered is the same or a close approximation of the name or identity of a person, living or dead, or of an institution and that it would be recognized as such.  It must also be clear that the person or institution identified by the mark is not connected with the goods or services performed by applicant under the mark.  Finally, it must be shown that the fame or reputation of the named person or institution is of such a nature that a connection with such person or institution would be presumed when the

3

applicant's mark is used on its goods or services.

See also, **In re Nuclear Research Corp.**, 16 USPQ2d 1316 (TTAB 1990.)

Moreover, in **In re Nuclear Research Corp.**, supra, the Board stated that the phrase "falsely suggest a connection with" requires, by implication, that the person or institution with whom a connection is suggested must be the prior user.

There is no question that NAFTA is an acronym for a treaty called the "North American Free Trade Agreement." See Acronyms, Initialisms & Abbreviations Dictionary (1993) made of record by the Examining Attorney. The term NAFTA has also received widespread publicity, as is shown by the excerpts from various articles made of record by the Examining Attorney, some of which we quote below:

> One day after Democratic presidential candidate Bill Clinton endorsed the North American Free Trade Agreement with reservations, an administration official said Oct. 5 that it would be "very difficult" to have a viable NAFTA under a Democratic administration.
>
> Speaking at a Border Trade Alliance on NAFTA....
> "Daily Report for Executives," Oct. 6, 1992
>           ***
>
> NAFTA ERODES U.S. POWER OF SELF-RULE (headline)
> ...but under NAFTA local power will be drastically reduced even further....
> "The Phoenix Gazette," Nov. 5, 1993

***

NAFTA expectations and reservations
(headline)
They could expect Carol Browner's
Environmental Protection Agency to have
something to say about it, and NAFTA
will provide the excuse.
"The Washington Times," Oct. 26, 1993

***

How Green Is NAFTA?  Two
environmentalists--one pro, one con--
take on the treaty  (headline)
...negotiated for NAFTA are very strong.
There's a five-step process.
"The San Francisco Chronicle," Oct. 24,
1993

...NAFTA, the trade treaty that has
become a major test of his presidency,
was coming up for a vote in Congress on
Nov. 17....  ...and the unions were
clobbering NAFTA with TV ads.  How,
Clinton and Gore wondered, do they sell
NAFTA?
"Newsweek," Nov. 15, 1993

***

The "Newsweek" article points out that NAFTA was a

major issue for President Clinton during the 1994

Congressional election campaign; as a result, most Americans

would be aware of this term.  The fact that many of the

articles refer to "NAFTA" in their headlines, and the

"Newsweek" article refers only to "NAFTA," without any

mention of the entire phrase "North American Free Trade

Agreement," supports the view that the term NAFTA is

recognized by the public at large.  Moreover, applicant has

acknowledged that the press and the U.S. government use the

acronym NAFTA to identify and discuss the trade agreement. Brief, p. 7.

While applicant's mark also includes the design of a globe, this does not avoid the commercial impression that the mark is the same as or a close approximation of the NAFTA treaty. One cannot overcome a refusal based on a false suggestion of a connection merely by adding a design element to an entity or institution's identity; in this case, moreover, the design which applicant has adopted reinforces that the mark will be identified with the NAFTA treaty because it depicts the three countries which are the parties to the agreement.

Thus, with respect to the requirement that the Office show the mark sought to be registered is the same or a close approximation of the name or identity of a person or of an institution and that it would be recognized as such, we have no doubt that applicant's mark would be recognized by both the general public and the specialized business audience which are the asserted consumers of applicant's services as the name or identity of the North American Free Trade Agreement.

Applicant has pointed out that the Trademark Act refers to a false suggestion of a connection with a person or institution, and argues that Section 2(a) cannot apply in this case because NAFTA is a treaty. While applicant recognizes that the term "institution" as used in Section 2(a) has been found to encompass universities, fraternal

6

organizations and professional organizations, brief, p.5, applicant argues that a trade agreement or treaty should not be considered an institution, and to do so would result in an institution being created whenever persons or institutions enter into a contract.

NAFTA is not merely a contract or agreement. Rather, it is an original treaty, with three supplemental agreements, between the United States, Canada and Mexico, which sets up a series of relationships between these countries on a number of issues ranging from trade to environmental concerns. Moreover, NAFTA provides for the establishment of a Free Trade Commission,[2] a Secretariat,[3] committees and working groups,[4] binational panels,[5] as well as the establishment of permanent offices in each country. The treaty further provides that the commissions, etc. are to support the work of committees and groups established under NAFTA and resolve disputes between the parties to the agreement.

The totality of NAFTA, thus, is not merely a contract, but it is the treaty, the supplemental agreements, and the various commissions, committees, offices, etc. which are established by those documents. When viewed as this totality, we find that NAFTA qualifies as an "institution"

---

[2] See Chapter Twenty, Article 2001(1).
[3] See, for example, Chapter Twenty, Article 2002.
[4] See, generally, Annex 2001.2.
[5] See, generally, Chapter 19.

7

within the meaning of Section 2(a) of the Trademark Act.[6]

In stating this, we are mindful of the legislative history

which indicates that the reference to an "institution" in

Section 2(a) was designed to have an expansive scope.  See

*Hearings on H.R. 4744 Before the Subcomm. on Trademarks of*

*the House Comm. on Patents*, 76th Cong., 1st Sess., (1939),

included as an appendix to **University of Notre Dame v. J.C.**

**Food Imports**, supra at 217 USPQ 510, 512.[7]

---

[6]  We also take judicial notice of the  Black's Law Dictionary
(5th ed. © 1979) definition of "institution" quoted by the
Examining Attorney in her brief:

> *Political law.*  A law, rite, or ceremony enjoined by
> authority as a permanent rule of conduct or of
> government.  An organized society, established either
> by law or the authority of individuals, for promoting
> any object public or social.
>
> A system or body of usages, laws, or regulations, of
> extensive and recurring operation, containing within
> itself an organism by which it effects its own
> independent action, continuance, and generally its
> own further development.  Its object is to generate,
> effect, regulate, or sanction a succession of acts,
> transactions, or productions of a peculiar kind or
> class.  We are likewise in the habit of calling
> single laws or usages "institutions," if their
> operation is of vital importance and vast scope, and
> if their continuance is in a high degree independent
> of any interfering power.

   (The Board may take judicial notice of dictionary
definitions. **Marcal Paper Mills, Inc. v. American Can Co.**, 212
USPQ 852 (TTAB 1981).

   The NAFTA treaty not only provides for the establishment of a
Secretariat, regional offices, committees, working groups and
the like, but it engendered further implementing legislation
passed by Congress, and Executive Orders issued by the
President.

[7]  We note applicant's position that the legislative history
"shows that the term 'institution' was included strictly for the
purpose of protecting 'fraternal societies and organizations.'"
Reply brief, p. 4.  However, although a treaty such as NAFTA was
not specifically mentioned during this discussion, it is our
view that the term "institution" was included so that Section
2(a) would have an expansive scope.

Applicant argues that its NAFTA and design mark is not unmistakenly associated with another institution because it does not point uniquely to an institution.  That is, applicant argues that NAFTA does not <u>only</u> identify a particular NAFTA commission nor does it <u>only</u> identify one of the signatories to the agreement.  We are not persuaded by this argument.  NAFTA, as we have previously stated, refers to the totality of the agreement, including the various commissions and offices established by it. It is this institution to which the term NAFTA points uniquely.  NAFTA is an institution, in the same way that the United Nations is an institution.  The United Nations was created by treaty to which different sovereign entities are signatories, and has various governing bodies such as a Secretariat and General Assembly, agencies which carry out specific tasks, and even armed forces.

We would also point out that, unlike <u>Notre Dame</u>, where Notre Dame was associated not only with the University, but identified a famous and sacred religious figure and was used in the names of churches dedicated to Notre Dame, such as the Cathedral in Paris, in this case NAFTA does not have a variety of well-known meanings.

This brings us to the requirement that the institution identified by the mark is not connected with the goods or services performed by applicant under the mark.  Clearly the Office has met its burden with respect to this requirement.

Applicant does not claim that it is part of, or established by, the NAFTA treaty.

The next requirement is that a connection with the NAFTA institution would be presumed when applicant's mark is used with its services. Applicant's services are "promotion of trade and investment among the United States, Canada, Mexico and other countries; providing information and consultation to members regarding the issues and effects of a free trade area on their investments." These services are closely related to the activities performed under the NAFTA agreement, the preamble of which states that the United States, Canada and Mexico are resolved to, inter alia:

> create an expanded and secure market for the goods and services produced in their territories;
>
> establish clear and mutually advantageous rules governing their trade;
>
> ensure a predictable commercial framework for business planning and investment; and
>
> enhance the competitiveness of their firms in global markets.

In addition, the NAFTA treaty establishes, inter alia, a Secretariat to facilitate the operation of the agreement (Article 2002); committees such as the Committee on Trade in Goods, which addresses issues related to movement of goods through the three countries' ports of entry (Article 316); and working groups such as the Working Group on Trade and Competition, which makes recommendations on issues

concerning the relationship between competition laws and policies and trade in the free trade area. (Article 1504). Given these similarities in the activities performed under NAFTA, and applicant's own activities, we find that a connection between applicant's activities and the institution of NAFTA would be presumed when applicant uses the mark NAFTA and design in connection with its services.

Applicant argues that it performs its services for its members, who are sophisticated international business persons. While applicant acknowledges that these people know that NAFTA is used by the press and the government to identify the trade agreement, it asserts that they would know that NAFTA and design, as applied to the services obtained from applicant, indicates the services of applicant. Applicant further explains that these sophisticated consumers would realize that the NAFTA treaty does not provide information services regarding the effects of a free trade area on investments, and that they, as well as the general public, would realize that only the three government signatories to the NAFTA treaty have standing to negotiate changes to the agreement.

We do not find applicant's arguments to be persuasive. The question is not whether its members, after learning who applicant is and what it does, realize that applicant is not connected with the NAFTA institution, but whether, upon seeing the trademark used in connection with applicant's services, the potential consumers of such services are

11

likely to believe that there is a connection.  Because of the number of committees, working groups and the like which are established by the treaty, even sophisticated business people may believe, when viewing the mark NAFTA and design in connection with the identified services, that applicant has been established pursuant to the treaty to facilitate trading and investment in the free trade area created by the treaty.  Or they may believe that applicant's services are sponsored or approved by one of the NAFTA Commissions, committees, working groups, etc.  Thus, even if they later learn that applicant is not connected with the NAFTA treaty, they may become members of applicant because of the false suggestion of a connection conveyed by applicant's mark.

Moreover, applicant's identified services include "promotion of trade and investment among the United States, Canada, Mexico and other countries," without any limitation as to its customers.  Such services could be rendered to the public at large, e.g., ordinary investors and small businesses which do not have the asserted sophistication of applicant's members.

Applicant recognizes that "the Notre Dame case, supra, states that even if there is no presumed connection between the free trade agreement and the Association's services, § 2(a) can be violated if the evidence shows that the applicant intended such a violation."  Brief, p. 8.  See Notre Dame, supra  at 217 USPQ at 509, "Evidence of such intent would be highly persuasive that the public will make

the intended false association."  Although applicant asserts that there is no evidence to indicate such an intent by applicant, we note that applicant's very name, North American Free Trade Association, is almost identical to the North American Free Trade Agreement, and that at the time applicant filed its reservation of name, and adopted its mark, applicant was well aware that NAFTA referred to the North American Free Trade Agreement.  In fact, applicant proudly states that its executives played a role "in the creation of a North American free trade agreement," and that its president testified before Congress in support of such an agreement.  Brief, p. 4.  Applicant's knowledge of the proposed treaty provides the evidence of applicant's intent in adopting its mark to identify the NAFTA treaty.

Finally, we turn to the "implicit" requirement that the person or institution with whom a connection is suggested must be the prior user of the term.  Applicant asserts that its use of its mark predates the NAFTA agreements, and predates the use of the globe design on the Supplemental NAFTA agreements.[8]  Applicant claims that it has used its mark since at least May 1, 1991.[9]  However, the United

---

[8]  As previously discussed, our conclusion that applicant's mark is the same or a close approximation of the institution of NAFTA was based on the inclusion in applicant's mark of the term NAFTA; thus, even if applicant can prove prior user of the globe design, this would not affect our decision herein.

[9]  Applicant has submitted with its brief a letter dated May 1, 1991 showing use of its mark on its stationery.  While applicant claims that this exhibit had been submitted with its original application "dated May 29, 1991," the original application papers were signed on June 24, 1991, and the application was filed on that date.  Moreover, this letter was not submitted

13

States government was using the term NAFTA to refer to a proposed North American Free Trade Agreement prior to that date. On March 1, 1991 President Bush submitted a report to Congress requesting the extension of fast track procedures to facilitate passage of certain foreign trade legislation. That report includes the following statement:

> North American FTA. We have a historic opportunity to achieve a North American Free Trade Agreement (NAFTA) with Canada and Mexico. ... Building on those reforms and on the existing FTA we have with Canada, we can create a NAFTA that encompasses some 360 million people with almost $6 trillion in output. A comprehensive NAFTA will create growth and better jobs in all three countries, and will make us more competitive in the global marketplace.

We recognize that the NAFTA treaty was not entered into until December 17, 1992, was not submitted to Congress until November 3, 1993, and was not formally approved by Congress until December 8, 1993. All of these dates were subsequent to applicant's claimed date of first use and the filing of its application. However, neither the date of execution of a treaty, nor the date it becomes effective, should be regarded as the date it acquires its identity. It is common knowledge that, when it comes to governmental activities,

---

with the original application (a blank piece of letterhead was filed). Because the May 1, 1991 letter was not made of record during the prosecution of the application, it cannot be considered at this point. In any event, whether we consider the dates of commerce claimed in the application or the application filing date as evidencing applicant's first use, it is clear, as will be discussed above, that applicant's use of NAFTA does not predate the use of the acronym NAFTA for the treaty.

14

substantial time may elapse from the moment an action is first proposed until it comes to fruition.  During the interim negotiation and discussion period, however, the name that is used for, e.g., an Executive Department or Agency, or a treaty, can receive substantial publicity and as a result it achieves an identity, or persona.  That is what occurred with the NAFTA treaty.  (Again, we point out that the fact applicant chose the name North American Free Trade Association, and used the mark NAFTA and design, months after the President of the United States proposed a North American Free Trade Agreement, indicates that the NAFTA treaty had achieved such an identity, and that applicant intended, by choosing its mark, that the public would make a false association with the institution of NAFTA.)

This case differs from **In re Nuclear Research Corp.**, 16 USPQ2d 1317 (TTAB 1990), in which the Board found that the applicant in that case had used the letters NRC long before the inception of the U.S. Nuclear Regulatory Commission.  As we have already noted, applicant was well aware of the proposal for a North American Free Trade Agreement, which was being identified by the acronym NAFTA, at the time it first used its mark.

Accordingly, we find that the Patent and Trademark Office has met its burden of proving that applicant's mark NAFTA and design falsely suggests a connection with the North American Free Trade Agreement, and we affirm the refusal on this ground.

15

In view of this finding, the requirement for a disclaimer of NAFTA is moot, since that requirement was made only if the mark was otherwise found registrable. However, in order to render an opinion on all issues, we hereby affirm this requirement. The term NAFTA in applicant's mark is merely descriptive of applicant's services. Specifically, the evidence shows that NAFTA is an acronym for the North American Free Trade Agreement, and applicant's identified services are the promotion of trade and investment in the countries which are signatory to that trade agreement, and the providing of advice regarding investments with respect to the free trade area. Therefore, NAFTA is merely descriptive of applicant's services, and must be disclaimed pursuant to Section 6 of the Trademark Act. Applicant's arguments that NAFTA might have any number of meanings are, to say the least, not persuasive. Applicant has previously acknowledged that the press and government refer to the North American Free Trade Agreement by the acronym NAFTA, and the evidence which is of record shows that this term is well-known to the general public. Applicant's suggestions that the term NAFTA in its mark could refer to services involving North Atlantic free trade or North American Feather Trading would require that the mark be viewed in a vacuum. However, it is well established that the question of whether a term in merely descriptive must be viewed in the context of the identified services. Moreover, applicant would have us consider the term NAFTA

16

per se, without the context of the entire mark, which includes the globe design featuring North America.  The meaning that consumers will ascribe to the term can be affected by the other material, and in this case the design reinforces that NAFTA is a reference to the treaty.

Decision:  The refusal pursuant to Section 2(a) is affirmed.  Further, even if applicant's mark were otherwise to be held registrable, the requirement for a disclaimer of NAFTA is affirmed.

R. L. Simms

E. J. Seeherman

P. T. Hairston
Administrative Trademark Judges
Trademark Trial and Appeal Board