THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
June 24, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Faucher Industries Inc.*

_____

Serial No. 85202870

_____

James R. Menker of Holley & Menker, PA for Faucher Industries Inc.

David Taylor, Trademark Examining Attorney, Law Office 112 (Angela Wilson, Managing Attorney).

_____

Before Bucher, Bergsman, and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Faucher Industries filed an application to register on the Principal Register the mark set forth below.[1]



---

[1] Application Serial No. 85202870, filed under Trademark Act §§ 1(b) and 44(e), 15 U.S.C. §§ 1051(b) and 1126(e), on December 21, 2010.

The application, as originally filed, identified a variety of electrical goods in International Class 9, including two items identified as "choke seals" and "choke seals for electric cables."

The examining attorney, upon first examination, issued an Office action stating that "The identification of goods is indefinite and must be clarified"; and that "Applicant must specify the common commercial or generic name for the goods." The examining attorney set forth a proposed form of identification in which all of the goods of applicant were set forth without change except the two items called "choke seals." With respect to these, he proposed as follows:

> Seals for use in [specify material composition and use; classification will vary depending upon specification], namely, choke seals
>
> Seals for electric cables [specify material composition], namely, choke seals.[2]

Applicant responded by amending the identification of choke seals to read as follows:

> electrical connections in the nature of choke seals for electric junction boxes;
>
> electrical connectors in the nature of choke seals for electric cables.

Applicant also submitted an excerpt from its online catalog relating to its choke seals; and an excerpt from a third-party catalog relating to a "Junction Box with cable fittings and Choke Seals." Applicant argued that its own catalog "categories [sic] such goods as 'electrical: line accessories'"; and that the third-party catalog

---

[2] Office action of March 23, 2011.

shows the goods to be "components of an electrical system." Applicant argued further:

> Because the US PTO classifies "electrical connectors" in International Class 9 regardless of material composition, Applicant avers that there is no justification for requirement that Applicant specify the material composition of its goods or that it *[sic]* goods be classified in any other class than International Class 9.[3]

The examining attorney then issued a final refusal to register the mark on the ground that "[t]he identification of goods remains indefinite and must be clarified. [Citation omitted.] The applicant must specify the material composition of the goods identified as 'seals'. Additionally, the applicant must indicate the field of use for the goods." The examining attorney again proposed a revised identification, this time suggesting that the choke seals might be characterized as being "metal seals" in Class 6, or "non-metal seals" in Class 17.[4]

Applicant responded with a request for reconsideration in which choke seals were identified as follows:

> choke seals, namely, connection fittings for electric junction boxes;
>
> choke seals, namely, connection fittings for electric cables.

In addition, applicant argued:

> Applicant has amended the identification of goods to clarify that the "choke seals" are "connection fittings". Applicant notes that "connection fittings" for electrical applications are classified in the ID Manual International Class 9 regardless of material composition. Further,

---

[3] Applicant's response filed September 15, 2011.

[4] Office action of October 21, 2011.

Applicant notes that "connection fittings" for electrical applications are accepted in the ID Manual without any specification of the material composition of those goods.[5]

The examining attorney denied the request for reconsideration. Applicant thereupon filed a second request for reconsideration, in which it made no change to the identification of goods, but argued as follows:

Applicant has previously explained that "choke seals" identifies the common commercial name of the goods. Therefore, an English speaker can understand what the goods are. Moreover, because the goods are specified as connection fitting for electric junction boxes and cables, these goods are correctly classified in International Class 9.

The request for reconsideration included two advertisements of third parties that refer to choke seals; and an excerpt from the U.S. Patent and Trademark Office Acceptable Identification of Goods and Services Manual (the "ID Manual"),[6] showing that goods identified as "Laboratory equipment, namely, plastic, rubber and elastomer closures, seals and stoppers for laboratory bottles" are classified in Class 9.[7] Again, the examining attorney denied the request and maintained his final refusal of registration. This appeal ensued.

1. Limits on Relief Available to Applicant.

Applicant argues that "choke seals" and "choke seals for electric cables" (the original wording of applicant's identification of goods) should be acceptable as identifications of the goods because they are the common commercial names of the

---

[5] Applicant's request for reconsideration filed October 24, 2011.

[6] The ID Manual can be viewed and downloaded from the Trademark Office website at http://www.uspto.gov.

[7] Request for reconsideration filed December 7, 2011.

4

goods. Alternatively, applicant requests "acceptance of one of its two proposed sets of amendments."[8]

Initially, we must point out that an *ex parte* appeal to the Board is not the ideal procedural context in which to assess an appropriate identification of applicant's goods. The Board may consider on appeal the examining attorney's final requirement of an amendment to the identification of goods. 37 C.F.R. § 2.141; *In re Stenographic Machines, Inc.*, 199 USPQ 313 (Comm'r Pats. 1978). However, the Board cannot, as applicant suggests, pick and choose among the three sets of identifications that were proposed during the prosecution of the application. The Board's ability to amend an application that it has reviewed on appeal is limited by the Trademark Rules. *See* 37 C.F.R. § 2.142(g) ("An application which has been considered and decided on appeal will not be reopened except for the entry of a disclaimer… or upon order of the Director…."). If the Board finds that the application as it now stands, including applicant's latest amended identification, is in acceptable form, the Board can reverse the examining attorney's refusal. However, the Board cannot re-write the application to reinstate an identification previously discarded by the applicant, nor can it re-open the application for amendment of the identification by applicant. Moreover, the Board will not review a requirement for amendment of the classification of the goods. *In re Tee-Pak, Inc.*, 164 USPQ 88 (TTAB 1969); TMEP § 1703. As the Board stated in *Tee-Pak*, "[t]he sole purpose of classification of goods is for internal administration within the

---

[8] Applicant's brief at 6.

Patent Office and the class to which a given product may be assigned does not and cannot limit or extend the rights of an applicant. [15 U.S.C. § 1112.] It is apparent that the question of proper classification is not a substantive one and therefore not a matter for appeal." 164 USPQ at 89. *See also* TMEP § 1703 ("[A] requirement for an amendment of the classification is a procedural matter that may only be reviewed on petition [to the Director].").

An option affording a broader scope of possible relief for applicant would have been a timely petition to the Director under 37 C.F.R. §§ 2.146(a) and 2.63(b). While questions of substance arising during the *ex parte* prosecution of an application are not appropriate subject matter for a petition to the Director, 37 C.F.R. § 2.146(b), requirements with respect to identifications of goods are generally regarded as petitionable matter. *In re Stenographic Machines*, 199 USPQ 313. The Director has more flexibility in providing a remedy to applicant, within the scope of her supervisory authority under 35 U.S.C. §§ 2 and 3, including the ability to address the question of the classification of the goods, the ability to reopen the application as contemplated by 37 C.F.R. § 2.142(g), and the authority to waive rules in accordance with 37 C.F.R. § 2.148.[9]

However, it is clear that the applicant's best option for resolving the issue of the identification and classification of its goods (and, in our view, the only option having a good likelihood of success) would have been to engage in a more open and

---

[9] The Director has delegated the authority to decide trademark-related petitions filed under 37 C.F.R. § 2.146 and to exercise supervisory authority in trademark-related matters pursuant to 35 U.S.C. § 2 to the Commissioner for Trademarks.

frank discussion with the examining attorney. Examination procedures provide ample time for discussion and resolution of the issues raised by an application. We note also that the examining attorney did not expressly limit the scope of his refusal to those particular goods as to which he deemed the identification indefinite (*i.e.*, the choke seals). Neither did applicant's counsel ever request that the examining attorney so limit his refusal. Had the refusal been so limited, an adverse outcome for applicant might have been limited to the abandonment of the application only as to those goods. *See* 37 C.F.R. § 2.65(a) and TMEP § 718.02(a). However, the option of partial abandonment is available only where a refusal or requirement was "expressly limited." 37 C.F.R. § 2.65(a). Following this rule, Office policy requires that the Office action must "expressly state[ ] that a refusal or requirement is limited to only certain goods/services/class(es). Unless the action includes a **clear and explicit** statement that the refusal or requirement applies to only certain goods/services/class(es), the refusal or requirement will apply to all the goods/services/class(es), and failure to respond to the action will result in abandonment of the entire application." TMEP § 718.02(a) (emphasis in original). As the appeal now stands, the disposition of the entire application will be determined by our decision relating to the identification of goods. It is unfortunate that the issues raised in this appeal could not have been resolved more efficiently.

2. <u>Analysis</u>.

The primary purposes for requiring a clear identification of the goods in a trademark application are (i) to allow for informed judgments concerning likelihood

of confusion under 15 U.S.C. § 1052(d) and (ii) to allow for the proper classification of the goods. TMEP § 1402.01. The classification of goods and services is an important organizational tool that greatly improves the ease with which information in the Trademark Office's various databases may be accessed -- not only by Trademark Office personnel but by innumerable users of those databases throughout the world. The Trademark Office classification system is based upon the Nice Agreement Concerning the International Classification of Goods and Services, to which the United States is a party. Each of the countries party to the Nice Agreement is obliged to apply the Nice Classification in connection with the registration of marks.[10] The examining attorney has discretion in determining the degree of particularity that is needed to clearly identify the goods and to classify them under the international system of classification that has been adopted by the Trademark Office. *In re Omega SA,* 494 F.3d 1362, 83 USPQ2d 1541 (Fed. Cir. 2007). Ideally, the appropriate class for an item ought, ultimately, to be unambiguous; however, any conclusion that such an ambiguity exists should be governed by the exercise of reason and in light of the evidence of record. *See In re Thor Tech, Inc.,* 85 USPQ2d 1474 (TTAB 2007).

Applicant states that "choke seal" is the generic name of applicant's goods. It is the policy of the Trademark Office to recognize industry terminology "as sufficient to identify the goods or services when supported by dictionary definitions or other

---

[10] The most recent guidance is contained in "International Classification of Goods and Services for the Purposes of the Registration of Marks" (10th ed. 2013), published by the World Intellectual Property Organization.

authoritative references." TMEP § 1402.03(f). However, there is no entry for "choke seal" in the MCGRAW-HILL DICTIONARY OF ENGINEERING (2nd ed. 2003); the MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS (6th ed. 2003); or the SCIENCE & TECHNOLOGY ENCYCLOPEDIA (1999).[11] Nor is there any other authority in the record setting forth the meaning of "choke seal." The excerpt from applicant's catalogue and the three third-party advertisements in the record contained limited information regarding the nature of the goods and they raised questions in the examining attorney's mind regarding the proper classification of the goods. It is not remarkable, therefore, that the examining attorney may have needed assistance in understanding the nature of the goods. It should be noted that under 37 C.F.R. § 2.61(b), the examining attorney is entitled to require information and evidence, if necessary, to ascertain the nature of the goods or otherwise permit proper examination of the application.

The examining attorney takes the position that the evidence of record relating to the nature of applicant's goods and similar goods of third parties "shows that the goods in question are non-electric seals used in connection with electric cables. … While it is shown that the goods are used in connection with electric products, they function in the same manner as typical seals in that they are used to join and seal two components; while allowing electrical cables to pass through an

---

[11] The Board may take judicial notice of dictionary definitions, *Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imp. Co.*, 213 USPQ 594 (TTAB 1982), *aff'd*, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983), including online dictionaries that exist in printed format or have regular fixed editions. *In re Red Bull GmbH*, 78 USPQ2d 1375, 1377 (TTAB 2006).

opening in the seal."[12]  He goes on to argue that the evidence establishes "that the goods in question are used in a manner that is consistent with typical 'seals' and that they have no electric functionality.  The goods are merely used to provide a seal between items that may have electric functionality."[13]  As his brief indicates, the examining attorney did not believe the goods should be in Class 9 unless they had some "electric functionality."[14]

The examining attorney sought to address his concerns initially by inquiring as to the material composition of applicant's goods.  This approach clearly derives from the fact that the ID Manual sets forth, as the broadest acceptable identification of a "seal," the following options:

> Metal seals for use in {indicate field of use}, in Class 6;
>
> Non-metal seals for use in {indicate field of use}, in Class 17.

Other more specific types of seals are classified differently; for example, some seals that are exclusively for vehicles are in Class 12 and some seals that are exclusively for engines are in Class 7.  The ID Manual contains no reference to a seal that is exclusively for use in electrical devices, whether in Class 9 or another class.[15]

---

[12] Examining attorney's brief at unnumbered pp. 5-6.

[13] *Id.* at 6.

[14] *Id.*

[15] Applicant did demonstrate that the identification "Laboratory equipment, namely, plastic, rubber and elastomer closures, seals and stoppers for laboratory bottles" appears in the ID Manual in Class 9.  We expect that these items were classified in Class 9 not because they are electrical goods, but because they are goods for use in scientific applications.

Moreover, the ID Manual shows that not all goods that are used in connection with electrical systems are classified in Class 9.

The record, as it stands, contains little information about the nature of applicant's goods. All of applicant's relevant statements regarding the nature of the goods are quoted above in our discussion of the prosecution history. In applicant's advertisement, the depiction of the goods suggests that they are similar to a plug of rubber or other flexible material, with no visible wiring or other electrical component; the advertisement provides no useful information about the goods, other than their dimensions, that they are "PUSH IN TYPE," and that the various listed items are "for" various numbers of "CONDUCTORS CABLE." The third-party ads also appear to depict plugs of some flexible material. The Betts brand "Push-In" choke seal is depicted in a cut-away cross section, showing the interior of the product and revealing no electrical elements inside the plug. The Betts product is described as follows:

> Patented watertight Choke-Seals and threaded cable entrance fittings assure a dry environment for connections.
> …
> These EPDM seals are used as water-tight entrance grommets. Part No. 920413 will accommodate 2, 3 and 4 conductor jacketed cable. Part No. 920420 will accommodate up to four individual primary wires. After installing in a lamp or junction box, pierce the Choke Seal diaphragm (DO NOT DRILL) and insert wire. Use wire pulling lubricant… before inserting cable. Both seals require a 9/16" diameter hole.[16]

---

[16] Submitted with request for reconsideration filed December 7, 2011.

The advertisement marked "Trailer Connectors" describes a circuit box by reference to the following feature: "Entrances stay dry by using the new "push-in" choke seals and threaded fittings – comes with 4 choke seals."[17]  At no time did applicant provide any explanation of the meaning of the information set forth in its own advertisement or in the third-party advertisements.  We note that the Betts choke seals are described as being "used as water-tight entrance grommets."  The definition of "grommet" appears highly pertinent to the goods at issue:

> **2 b**  a device like a ring that is designed to protect or insulate something passed through it : as (1) **:** a bushing designed to protect from abrasion a cord or wire passing through a hole  **3 :**  a gasket or packing used to prevent leakage (as of steam) or entry (as of dust).

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993) p. 1001.

Under the circumstances, the examining attorney could reasonably have believed that applicant's choke seals were analogous to insulating goods or gaskets.  This possibility would have affected the classification of the goods.  The ID Manual indicates that electrical insulating products, whether of rubber, ceramic, mica, or other materials, are in Class 17; it also shows that most non-metal gaskets are in Class 17, while metal gaskets are in Class 6.

In questioning the nature of the goods, in view of the evidence in the record, the examining attorney was following Trademark Office policy: "An identification is unacceptable if it is inconsistent with the goods or services indicated by the specimens, or if the ordinary meaning of the identification language is at variance

---

[17] *Id.*

with the goods or services evidenced by the specimens or any other part of the record." TMEP § 1402.05. The examining attorney's power to question such inconsistencies is settled. *See, e.g., The Procter & Gamble Co. v. Economics Laboratory, Inc.*, 175 USPQ 505, 509 (TTAB 1972), *modified without opinion*, 498 F.2d 1406, 181 USPQ 722 (CCPA 1974); *In re Petroglyph Games, Inc.*, 91 USPQ2d 1332, 1335 (TTAB 2009).

Applicant argues that its first amended identification should have been accepted because "electrical connectors" and "electrical connections" are listed in the ID Manual; and that its second amended identification should have been accepted because "connection fittings" appears in the ID Manual in the context of the item identified as "electric cables, wires, conductors and connection fittings therefor."[18] These arguments are unavailing in the face of the apparent inconsistency between the goods depicted in the evidence and the ordinary meaning of the identification language. In light of the evidence before him, the examining attorney could reasonably question whether the choke seals depicted in the evidence of record could be properly characterized as "electrical connectors," "electrical connections," or "connection fittings" in Class 9.[19]

As applicant acknowledges in its brief,[20] the TMEP sets forth four requirements of an acceptable identification:

---

[18] Applicant's brief at 6.

[19] We also doubt whether the fact that "electric cables, wires, conductors and connection fittings therefor" is an acceptable identification sufficiently supports the conclusion that "connection fittings" is an equally acceptable identification.

[20] Applicant's brief at 4.

> With few exceptions, an identification of goods and services will be considered acceptable if it:
>
> > Describes the goods and/or services so that an English speaker could understand what the goods and/or services are, even if the grammar or phrasing is not optimal;
> >
> > Meets the standards (not necessarily the language) set forth in the USPTO ID Manual;
> >
> > Is not a class heading; and
> >
> > Is in the correct class, i.e., there is no language in the identification that makes classification difficult or ambiguous; each class lists goods or services that are clearly in a single class.
>
> Deference should be given to the language set forth by the applicant in the original application.

TMEP § 1402.01(a).

The examining attorney needed more information in order to determine the proper classification of the goods. We find that the examining attorney's requirement that applicant disclose the material composition of its goods so that proper classification could be determined was reasonable and correct. *In re Omega*, 83 USPQ2d at 1544. We also find that he needed additional information in order to determine whether the goods depicted in applicant's evidence should be considered "electrical connections," "electrical connectors," or "connection fittings" within International Class 9. It would likely have been useful to the examining attorney to know, as well, whether the goods contained any components that have an electrical function. This issue might have been reached had the dialogue with applicant

progressed beyond the examining attorney's stymied efforts to learn the material composition of the goods. In any event, for the reasons explained above, we find that the various identifications proffered by applicant do not "meet the standards" of the ID Manual, nor do they contain enough information so that classification of the goods is not "difficult or ambiguous." TMEP § 1402.01(a).

**Decision:** The refusal to register is affirmed.