59 CCPA

**FREDERICK GASH, INC., Appellant,**

v.

**MAYO CLINIC and Mayo Foundation, Appellees.**

**Patent Appeal No. 8677.**

United States Court of Customs and Patent Appeals.

June 15, 1972.

Rehearing Denied Aug. 10, 1972.

Alan H. Levine, Judah B. Felshin, New York City, attys. of record, for appellant.

Phillip H. Smith, Minneapolis, Minn., Robert G. McMorrow, Washington, D.C., attys. of record, for appellees.

Before RICH, ALMOND, BALDWIN and LANE, Associate Judges, and RO-SENSTEIN, Judge, United States Customs Court, sitting by designation.

LANE, Judge.

This appeal is from the decision of the Trademark Trial and Appeal Board, 162 USPQ 263 (1969), sustaining an opposition to the registration [1] of "mayo 7," stylized as shown below, for "imitation, low calorie mayonnaise." Our review of the record and arguments in this case convinces us that the board committed reversible error, and we accordingly reverse its decision.

[A5923]

The Mayo Clinic is a voluntary association of individuals engaged in the group practice of medicine at Rochester, Minnesota. Its fame admittedly extends world-wide. The Mayo Foundation is asserted to be an eleemosynary corporation of Minnesota which owns and holds legal title to all of the assets and properties used by the Mayo Clinic. The name "Mayo" derives from that of the Clinic's founders, the Doctors William J. and Charles H. Mayo.

In their notice of opposition, appellees alleged that the Mayo Foundation is the owner of the name "Mayo" and that the Mayo Clinic uses "Mayo" with the Foundation's consent. The name "Mayo," it was asserted, has come to be recognized by the public as synonymous with the services rendered by the Clinic. Among those services is the prescription of diets and the preparation of diet manuals for the Clinic's patients. Because of the presence of the name "Mayo" and the fact that the food product to which "mayo 7" is applied is a dietetic product, the mark sought to be registered is, ap-

1. Appellant's application Serial No. 254,-270, filed September 12, 1966, and alleg-ing a date of first use in commerce May 20, 1966.

pellants urge, likely to suggest a connection with the Mayo Clinic.

Much of the board's opinion is devoted to the nature and reputation of the Mayo Clinic. The board also observed that "[f]or some reason, a spurious diet referred to by many publications and by many people as the 'Mayo Clinic Diet' has received wide circulation." The board noted that although the Mayo Clinic sought to "dispel any association of that diet with the Clinic," many inquiries were nevertheless received. Against the factual background herein outlined, the board held:

> Considering the fame of the name "Mayo Clinic" and that the public does associate that name with diet menus and programs and considering that applicant's low calorie imitation mayonnaise is a diet product which would be purchased by diet conscious persons, it is our opinion that the utilization of "MAYO" as part of applicant's mark will result in confusion in the minds of such persons to the extent that such persons will readily conclude that opposer sponsors or recommends applicant's product. Since such is not the case, opposers will necessarily be damaged by the issuance of the registration sought by applicant.

Appellant contended that the term "mayo" is a well-known slang expression for mayonnaise and quoted the Dictionary of American Slang which states: "Mayo-n. Mayonnaise. Common lunch counter use since about 1930." The board rejected the argument holding that:

> Applicant's product, however, is one that comprises a grocery store product and there is no indication that the public, aside from lunch counter personnel, is aware of such meaning. The dictionaries available to us, Webster's Unabridged, second and third editions, Funk & Wagnall's New Standard Dictionary of the English

Language, 1958; and the Complete Dictionary of Abbreviations, Robert J. Schwartz, Thomas Y. Crowell Company, New York, 1955, do not include any reference to "mayo" as an indication for or abbreviation of the word "mayonnaise". There is no evidence of any probative value to buttress applicant's contention.

The issue before us is expressed by appellees as:

> * * * whether in view of the widespread popularity of the name "MAYO" and the public's association of that name with diet menus and programs, the Trademark Trial and Appeal Board erred in determining that Appellant's proposed use of the mark "mayo 7" would result in confusion of the extent that diet conscious persons would readily conclude that Appellees sponsor or recommend Appellant's product.

Appellees' opposition is therefore predicated on § 2(a) of the Lanham Act, 15 U.S.C. § 1052(a), which reads as follows:

> No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—
>
> (a) Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute * * *.

The inquiry under this provision of the statute is similar to that under § 2(d), 15 U.S.C. § 1052(d), which is likelihood of confusion of the marks as applied to the respective goods and/or services. See Morehouse Manufacturing Corp. v. J. Strickland Co., 407 F.2d 881, 888, 56 CCPA 946, 955 (1969).

The thrust of appellant's position is that the board stressed the wrong facts.

The board, in appellant's view, focused too heavily on the reputation of the Mayo Clinic and in so doing, failed to appreciate (1) the differences between "mayo 7," stylized as it is with "mayo" in lower case letters, and "Mayo" and (2) the fact that "mayo" is so highly suggestive of mayonnaise. Appellees, on the other hand, contend the board was correct in giving substantial weight to the popularity of the name "Mayo" in connection with the Mayo Clinic and its diet programs and urge that as a whole the name "Mayo" and appellant's mark are quite similar.

## OPINION

■ We do not think that the Mayo Clinic would come to the mind of the average purchaser confronted with a packaged food product bearing the stylized mark "mayo 7." As a practical matter, medical institutions are not thought of as goods producers, and it is not to be expected that a consumer would associate the Mayo Clinic as the source of the mayonnaise in this case. Moreover, we do not think it likely that one would consider that the Mayo Clinic has approved of this low calorie product. This is a food, not a diet. There is no evidence of record of which we are aware that tends to prove that the Mayo Clinic endorses as such any line of foods produced by any food manufacturer. It seems that were an endorsement intended, it would be more clearly expressed than by the mere use of "mayo" in lower case letters with nothing else but a "7" which lacks any particular inherent suggestion. In short, a role of the Mayo Clinic as a sponsor or endorser simply would not be suggested by the mark "mayo 7."

■ These conclusions are reinforced by the fact that "mayo" is a recognized slang expression for "mayonnaise." The provision for this term in the Dictionary of American Slang [2] is probative and persuasive evidence of the wide acceptance of "mayo" as a vernacular synonym of "mayonnaise." Unlike the TTAB, we are not disturbed by the absence of "mayo" in other dictionaries of the English language. The Dictionary of American Slang is a specialized and reputable authority on slang expressions, and the inclusion of "mayo" therein is strong evidence that the term is in common usage in America.

Since we conclude that the average purchaser viewing "mayo 7" on a jar of low calorie imitation mayonnaise would not think of the Mayo Clinic, but would instead think of the food product, we do not find any likelihood of confusion of the mark here involved with either the Mayo Clinic, Mayo Foundation or the Mayo Brothers. The decision of the board is accordingly reversed.

Reversed.

ROSENSTEIN, Judge, dissenting, with whom RICH, Judge, joins.

I disagree with the reasoning and conclusion of the majority, and respectfully record my dissent.

In their notice of opposition, opposers Mayo Clinic and Mayo Foundation allege, inter alia, that the name "Mayo" has become well known to the general public as a result of their respective activities and services in the health field, and that "Mayo" is synonymous with opposers and their services; that the goods of appellant are directed to those interested in reducing or on a diet, and are related to the services of Mayo Clinic inasmuch as its doctors often prescribe diets tailored to needs of pa-

2. Appellees assert that since the excerpt from the dictionary relied upon by appellant was not introduced in evidence, it is not in the record and therefore not before us. However, the board considered it and there is no indication that appellees objected to it below. Certainly the board did not treat such an objection. We accordingly consider the dictionary definition reproduced in the board's opinion to be properly before us, and appellant may rely upon it.

tients; that appellant's mark "Consists of or comprises * * * matter which may disparage or falsely suggest a connection with persons, living or dead, institutions * * * "[1]—in this case, with the persons Doctors William J. Mayo and Charles H. Mayo, now deceased and widely known as the "Mayo Brothers," and with the institutions, Mayo Clinic and Mayo Foundation; and that appellant's mark "mayo 7" so resembles "Mayo", "Mayo Brothers", "Mayo Clinic" and "Mayo Foundation" as to be likely, when applied to appellant's low calorie mayonnaise, to cause confusion or mistake on the part of the purchasing public with the result that said purchasers would likely assume that appellant's goods are manufactured by opposers or under their supervision, or have received opposer's endorsement or approval, or are associated in some manner with opposers, all fraught with damage and detriment to opposers and the public.

In its opinion, the board made extensive findings of fact based, apparently, on testimony and exhibits introduced into evidence in the proceedings below. I say "apparently" because the record before us includes none of such testimony or exhibits, although appellees' brief refers to a few individual exhibits. Thus, of necessity, I take the liberty of adopting the board's findings, none of which appears seriously challenged:

Opposer, Mayo Clinic, is a voluntary association of individuals engaged in the group practice of medicine in Rochester, Minnesota. Mayo Clinic had its inception in the early medical practice of Dr. William Worrall Mayo who came to Rochester, Minnesota in 1863 as an examining surgeon for the Civil War Induction Board. His sons, Dr. William James Mayo and Dr. Charles Horace Mayo, later joined their father in medical practice. Their reputation grew and their practice flourished. Patients came from an ever increasing area and other physicians associated themselves with the doctors Mayo. Since 1903, the group medical practice of the well known Mayo brothers has been designated as "Mayo Clinic." Presently, the professional staff of Mayo Clinic numbers approximately 500. The paramedical staff comprises approximately 2500 persons. The professional staff of Mayo Clinic is organized into various medical sections, with approximately 60 different medical specialties being recognized.

Mayo Foundation, organized in 1915, owns all of the physical assets of Mayo Clinic and pays all of the staff of Mayo Clinic annual compensation. All profits from the operation of Mayo Clinic go to the Foundation as rent for the use of the physical assets. With the profits, the Foundation carries out the medical research and medical education programs of the Mayo organization. This includes the Mayo Graduate School of Medicine, the faculty of which is composed entirely of Mayo Clinic staff physicians, the School of Physical Therapy and the School for Nurse Anesthetists. The educational programs also include sponsorships of lectures, seminars, discussions and conferences conducted for groups of doctors.

The Clinic conducts an extensive dietetic program directed to the care of patients with a variety of conditions requiring special management. Special and appropriate diets are established for such patients. This program has resulted in the publication and distribution of a large number of diet publications.

In 1967, Mayo Clinic handled nearly 200,000 patients who came from all of the states of the United States and many foreign countries.

The story of the Mayo Clinic has received wide promotion and publicity. Articles about the Clinic have appeared in Saturday Evening Post,

1. Lanham Act, § 2(a) (15 U.S.C. § 1052(a)).

Business Week, Medical News, Look, Time, Newsweek, Realities and the Chicago Tribune Sunday Magazine. In addition there have been television programs regarding Mayo Clinic.

For some reason, a spurious diet referred to by many publications and by many people as the "Mayo Clinic Diet" has received wide circulation. As a result thereof, the Mayo Clinic has received a large volume of correspondence regarding this diet notwithstanding that the Clinic has gone to considerable effort in an attempt to dispel any association of that diet with the Clinic. The notoriety of the spurious "Mayo Clinic Diet" is indicated by the fact that Mayo Clinic has received as many as 770 inquiries in a single month concerning that diet.

In sustaining the opposition, the board stated:

> Considering the fame of the name "Mayo Clinic" and that the public does associate that name with diet menus and programs and considering that applicant's low calorie imitation mayonnaise is a diet product which would be purchased by diet conscious persons, it is our opinion that the utilization of "MAYO" as part of applicant's mark will result in confusion in the minds of such persons to the extent that such persons will readily conclude that opposer sponsors or recommends applicant's product. Since such is not the case, opposers will necessarily be damaged by the issuance of the registration sought by applicant.

It appears to me that the board has done a careful job with a record which adequately supports its conclusions, and I would not lightly overturn its decision on the force of appellant's arguments here. Foremost-McKesson, Inc. v. Foremost Sales Promotions, Inc., 443 F.2d 1191, 58 CCPA 1308 (1971); Witco Chemical Co. v. Whitfield Chemical Co.,

418 F.2d 1403, 57 CCPA 804 (1969). Appellant prefaces its remarks by acknowledging that the board's decision "might make sense" if appellant were engaged in selling "low calorie cookies or ice cream or soft drinks or any product other than mayonnaise." In view of that, it is apparent that even appellant does not have the temerity to agree with much of what the majority says in its first paragraph under the heading "OPINION". It goes on to contend, however, as does the majority, that the board failed to recognize that the "Mayo" portion of its mark is a well-known, widely used slang term meaning "mayonnaise". It refers here, as it did below, to the "Dictionary of American Slang"[2] which carries the following definition "mayo—n. mayonnaise. Common lunch counter use since about 1930." In light of that definition, appellant maintains:

> It should be clear from this fact alone that anyone seeing the term "mayo" on a jar of mayonnaise will immediately associate *mayo* with *mayonnaise*. On the other hand, it seems rather far-fetched to conclude that a supermarket purchaser seeing Appellant's trademark "mayo 7" on a jar of mayonnaise will think of the Mayo Clinic, even if the mayonnaise is of the low calorie variety and the Mayo Clinic does prescribe diets.

I think the fallacy in appellant's argument (which the majority apparently adopts) lies in its fierce embrace of— but rather myopic preoccupation with— the view that *all* or even most purchasers are aware of the slangish expression "mayo" as meaning "mayonnaise," and that they would, as a matter of course, necessarily associate "mayo" only with mayonnaise when seeing it appear on a label attached to a mayonnaise container. Certainly, one definition of a slang expression appearing in a dictionary of American slang is not conclusive or even probative evidence of the etymological or linguistic knowledge, or the language

---

2. Published by Thomas Y. Crowell Co. (1967).

habits and usage, of the entire population, as appellant and the majority opinion would have us believe. Nor is it conclusive or probative evidence that even a majority, much less everyone, has heard or is otherwise aware of "mayo" as meaning mayonnaise, or that the term is used in most or all lunch counters in the country.[3] Merely because a word appears in a dictionary does not necessarily prove that the average person is familiar with its meaning, Tiffany & Co. v. National Gypsum Co., 459 F.2d 527, 59 CCPA (decided May 25, 1972). The words "nobble", "res ipsa loquitur" and "tiffany" appear in the dictionary also, but how many people use them in the dictionary sense or know their meaning? At best I can infer from the dictionary definition of concern here that *some* of the populace will immediately recognize "mayo" as a synonym for "mayonnaise." Perhaps others will draw that association even without prior knowledge of that meaning of "mayo."

I am convinced, however, that still others who are equally unfamiliar with the particular vulgarism or slang expression which "mayo" is intended to represent are not so likely to draw the connection appellant has planned. In this day and age, many members of the consuming public consider that proper food is as essential to well-being and health as proper medicine. "Mayo" is one of the best known—indeed, famous—names in the medical health field, and the "Mayo Diet" or "Mayo Clinic Diet," though perchance spurious, is equally well known. Rightly or wrongly, the public has already demonstrated a proclivity to associate diet programs and menus with the Mayo Clinic, as the board pointed out. I think that the natural inclination of many health and diet conscious purchasers of appellant's low calorie mayonnaise—cognizant of the prestige and esteem which has attached to the name Mayo and Mayo Clinic in the health service field over the past 50 years and also of the various real and spurious diet programs and menus attributed to the Mayo Clinic, but unaware of any policy that opposers may have of not endorsing any health and diet food product—would be to think that the "mayo 7" dietetic product, so labelled, is associated or connected in some manner with opposers. I am of the view the foregoing comments are true whether the prospective purchasers of appellant's product frequent their grocery in Rochester, Minnesota,[4] or in New York City.[5]

In short, considering the mark in its entirety, I think "mayo 7" on low calorie mayonnaise may suggest a connection with the Mayo Clinic and Mayo Foundation to substantial segments of the purchasing public, particularly those in the midwestern states. Since that suggestion is false, and confusion or mistake is likely, opposers would be damaged by the registration sought. At the very least, doubt should be resolved on that issue against the newcomer in accordance with well-established precedent.

I would affirm.

---

. Interestingly enough, the American Thesaurus of Slang, 2nd edition (1962) lists "may" as a restaurant slang expression for "mayonnaise" at page 816, but carries no listing or definition whatsoever for "mayo."

4. Compare Mayo Clinic v. Mayo's Drug and Cosmetic, Inc., 262 Minn. 101, 113 N.W.2d 852 (1962).

5. In seeking registration rights of potentially national scope, appellant has not restricted its application to any particular marketing area of the country, and the record before us is devoid of evidence of appellant's present or proposed marketing areas. See Hunt Foods and Industries, Inc. v. Gerson Stewart Corp., 367 F.2d 431, 54 CCPA 751 (1966).