Hearing:
May 11, 2004

This Opinion Is
Citable as Precedent
of the TTAB

Mailed:
September 9, 2004

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Julie White
_____

Serial No. 78175476
_____

Eugene Berman, Esq. for Julie White, applicant.

M. Catherine Faint, Trademark Examining Attorney, Law
Office 103 (Michael Hamilton, Managing Attorney).
_____

Before Hohein, Walters and Rogers,
Administrative Trademark Judges.

Opinion by Rogers, Administrative Trademark Judge:

Julie White [hereinafter applicant], a United States
citizen and a Member of the St. Regis Band of Mohawk
Indians of New York, has applied to register APACHE (in
typed form) on the Principal Register as a trademark for
goods identified as "cigarette products, namely
cigarettes," in Class 34.[1]  The examining attorney has

_____

[1] The application is based on applicant's statement that she has
a bona fide intention to use the mark in commerce for the goods.

refused registration under Section 2(a) of the Trademark Act, 15 U.S.C. §1052(a), on the ground that when APACHE is used for cigarettes, it "may falsely suggest a connection with the nine federally recognized Apache tribes." Brief, unnumbered p. 2.

When the refusal of registration was made final, applicant appealed. Applicant and the examining attorney have filed briefs; and applicant's attorney and the examining attorney presented arguments at an oral hearing before the Board.

First, we discuss the record. In doing so, we also note certain contentions made by applicant and the examining attorney about the claimed significance of various items.

### *The Record*

With her initial refusal of registration, the examining attorney provided copies of what appear to be reprints of certain web pages. These were offered to establish that "[s]everal Apache tribes sell cigarettes and other tobacco products." First office action, p. 2. In her final refusal of registration, the examining attorney relied on a dictionary definition of "Apache" as meaning "A Native American people inhabiting the Southwest United

States," and a reference work entitled "American Indian Reservations and Trust Areas," published in 1996 by Tiller Research under an award from the U.S. Department of Commerce's Economic Development Administration. The Tiller Research publication provides information about, among others, various federally-recognized Apache tribes in three Southwestern states -- Arizona, New Mexico and Oklahoma. The examining attorney relied on these items to support her conclusion that "the overwhelming significance of the word 'Apache' is as an identifier of an Indian Tribe residing in the United States." Final office action, p. 3. In addition, the final refusal was used to introduce numerous web pages, purportedly "showing that Indian tribes commonly make and/or sell cigarettes, and that at least one Apache tribe sells cigarettes." Id.

Applicant, with her response to the initial refusal, submitted a three-page list from a report based on a search of federally registered marks, and applications for such registrations, which consist of or include the term "Apache." The three pages, numbered 6-8, are excerpts from a larger search report and list only the retrieved marks, the class or classes of goods or services covered by the registration or application, the application serial number, the registration number (if registered), and the status

(i.e., pending, abandoned, registered, renewed, expired, cancelled). The list does not provide the goods or services or the owners of the applications or registrations.[2] Applicant contends that this list shows that none of the owners of the applications or registrations appear to have any association with the federally-recognized Apache tribes and that the term Apache is "broadly used and is not recognized and certainly not 'uniquely and unmistakably' [sic] with any of these tribes." Response, p. 3.[3] Also included with applicant's response to the initial refusal is a declaration by applicant averring, among other things, that she is an employee of Native Trading Associates, which is a licensee of the St. Regis Mohawk Tribe, and is in the business of manufacturing "cigarettes for resale on tribal reservations."

---

[2] The list comprises 59 entries. The first 41 are for the mark APACHE; the next 10 are for marks that include the term APACHE; the last eight merely include the letter string A-C-H-E or similar letter strings. Of the 41 listings of APACHE per se, only 21 are listed as either "registered" or "renewed." Of the ten marks that include the term APACHE, only two are listed as either "registered" or "renewed." Thus, of the 59 listings in the search report, only 23 are listed as registered or renewed, as of the time of the report, and as consisting of the word APACHE per se or including that word.

[3] In her response, applicant makes certain assertions about the owners of registrations in the search report list and about goods covered by the registrations. These assertions are not supported by the list, which does not reveal goods or owners, or by any other evidence.

4

With her appeal brief, applicant submitted copies of certain items already in the record, including the list of Apache mark applications or registrations excerpted from the search report and certain web pages previously introduced by the examining attorney. Evidence submitted for the first time via the brief consists of reprints of information retrieved from the USPTO TARR database about two pending applications for the mark APACHE. One application is for goods identified as "body spray used as a fragrance and as a personal deodorant" and the other is for goods identified as "lacrosse handles." Referencing the first of these, applicant in essence asserts that it is inconsistent for the examining attorney to refuse applicant's application to register APACHE as a mark for cigarettes when the examining attorney allowed APACHE to be published for opposition as a mark for "body spray used as a fragrance and as a personal deodorant." Brief, pp. 9 and 11. Applicant does not discuss the application to register APACHE as a mark for "lacrosse handles."

Finally, with her reply brief, applicant has submitted dictionary definitions of "apache" and "Apache," as well as reprints of information retrieved from the USPTO TARR database on 38 registrations or previous registrations listed in the earlier submitted search report excerpt. In

5

regard to the TARR reprints, applicant asserts that TBMP Section 1207.03 allows for submission of application or registration information with a reply brief.

We disagree with applicant's reading of TBMP Section 1207.03 and cases cited therein. Nothing in that section of the Board's manual, or in any of the cases discussed therein, contemplates submission of evidence, for the first time, with a reply brief. Accordingly, we have not further considered the TARR printouts of registration records submitted by applicant with her reply brief. In contrast, we have considered the two TARR printouts submitted for the first time with applicant's main brief, as their submission falls within the circumstances covered by TBMP Section 1207.03 (2d ed., rev. 2004). Also, because the Board may take judicial notice of dictionary definitions at any time, we have considered the definitions of "apache" and "Apache" submitted by applicant with her reply brief.

As to evidence relied on by the examining attorney in her two office actions, we note that the majority of it consists of printouts of Internet web pages, denominated as numbered attachments to each action.[4] Applicant did not

---

[4] There were three such attachments to the initial office action and 11 to the second action (the final refusal). Of the 11 attachments to the final, one [#2] is not a separate attachment per se and really is part of attachment #1, and another [#4]

object to any of these attachments.  In fact, in her main

brief, on pages 7-9, applicant addressed the examining

attorney's Internet evidence.  Accordingly, we have

considered all the Internet evidence put into the record by

the examining attorney.[5]  We also have considered the

dictionary definition of "Apache" and the Tiller Research

publication on which the examining attorney relied.

**The Refusal Under Section 2(a)**

As noted earlier, the sole ground for refusal is the

examining attorney's contention that registration of APACHE

to applicant would violate Section 2(a) of the Trademark

---

would be separately admissible as a NEXIS article excerpt but
just happens to have been retrieved via the Internet.

[5] We note, however, that various web pages submitted by the
examining attorney might have been excluded upon a proper
objection by applicant.  The examining attorney apparently
retrieved the web pages from the Internet and downloaded them
into a template with a header bearing the serial number of
applicant's application, a brief description of, or name of, the
web page and an appropriate attachment number.  Many of the web
pages, however, when inserted into this template, do not list a
complete web address specifying where the page could be found on
the Internet; and all but a few bear no indication of the date
the site was visited and the page was downloaded.  We note, in
particular, the Google search engine statement at the top of
attachment #1 to the final refusal, as an ideal example of a way
in which to submit Internet evidence [whether by an applicant or
an examining attorney].  However, even without a statement from
the search engine or web browser specifying the address and date
of the page [and providing a link to the current page for that
address], as the Google statement does, Internet evidence would
be acceptable in an ex parte case when the full address for the
page, and the date the page was accessed and downloaded, are
provided.

Act by falsely suggesting a connection between applicant and the federally recognized Apache tribes. As a threshold matter, we must determine whether the false suggestion provision of Section 2(a) can be applied in this case, as that provision requires a showing of false suggestion of a connection "with persons, living or dead, institutions, beliefs, or national symbols."

Section 2(a) contains three parts, set off by semi-colons. The first part provides that "immoral, deceptive, or scandalous matter" shall not be registered, and the third deals with indicators of the geographic origin of wines or spirits. Neither of these provisions is tied to "persons, living or dead, institutions, beliefs, or national symbols," as is the second part of Section 2(a). The second part prohibits registration of (emphasis added) "matter which may disparage **or** falsely suggest a connection with persons, living or dead, institutions, beliefs or national symbols, **or** bring them into contempt or disrepute."

The plain meaning of this particular provision of the statute requires refusal of registration of three types of proposed marks: (1) matter which disparages persons, institutions, beliefs or national symbols; (2) matter which falsely suggests a connection with persons, institutions,

beliefs or national symbols; and (3) matter which brings persons, institutions, beliefs or national symbols into contempt or disrepute. As these three grounds for refusal all derive from the same subsection of Section 2(a) and all require a connection of the matter refused registration with "persons, institutions, beliefs or national symbols," we may look to prior cases involving any one of these refusals to determine the threshold question in this case, i.e., whether APACHE falsely suggests a connection with "persons" or "institutions."[6] In other words, while the substantive elements for each of the three refusals embodied in this part of Section 2(a) may, and do, vary, there is nothing in the language of the statute to suggest that the meaning of "persons" or "institutions" is any broader or narrower for one of these grounds for refusal as opposed to another.

Section 45 of the Trademark Act, 15 U.S.C. § 1127, broadly defines "person" and "juristic person." Section 2(a) has been held to apply to commercial, juristic persons, as well as natural persons. University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co., 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983). "Institutions" was

---

[6] There can be no real question that this case does not involve "beliefs" or "national symbols."

broadly construed in In re North American Free Trade Association, 43 USPQ2d 1282 (TTAB 1998) [hereinafter NAFTA], and in In re Urbano, 51 USPQ2d 1776 (TTAB 1999). A case involving both the "scandalous" and "disparaging" subsections of Section 2(a) discusses whether MOONIES and design was disparaging of The Unification Church (an institution or juristic person) or members thereof (natural persons), some of whom may have viewed the term MOONIES as derogatory. See In re In Over Our Heads Inc., 16 USPQ2d 1653 (TTAB 1990). In a cancellation case brought by a fraternal association and which involved a pleading alleging disparagement of the association as an entity, the Board considered whether the involved mark was disparaging "either to members of the Order or Italian-Americans in general." Order Sons of Italy in America v. Memphis Mafia Inc., 52 USPQ2d 1364 (TTAB 1999). Finally, in another case involving various claims under Section 2(a), and in the context of discussing the disparagement claim, the Board explained:

> Who comprises the targeted, or relevant, group must be determined on the basis of the facts in each case. For example, if the alleged disparagement is of a religious group or its iconography, the relevant group may be the members and clergy of that religion; if the alleged disparagement is of an academic institution, the relevant group may be the

students, faculty, administration, and alumni; if
the alleged disparagement is of a national
symbol, the relevant group may be citizens of
that country.

Harjo v. Pro-Football Inc., 50 USPQ2d 1705, 1739 (TTAB

1999), *reversed* on other grounds by Pro-Football Inc. v.

Harjo, 284 F.Supp.2d 96, 68 USPQ2d 1225 (DC DC 2003).

In this case, we have followed the course charted by

Section 45 of the statute and the referenced decisions, and

have given broad consideration to the question whether

APACHE would, when used on the identified goods, suggest a

connection, albeit falsely according to the examining

attorney, with "persons" or "institutions."  We note, too,

that the statute utilizes the plural for each of these

terms.  Thus, the statute clearly contemplates refusal of

matter that would falsely suggest a connection with

multiple persons, whether natural or juristic, or with

multiple institutions.

The record in this case does not include detailed

information about the legal status of the various Apache

tribes, but applicant and the examining attorney appear to

agree that there are nine "federally-recognized" Apache

tribes.  Applicant's brief, p. 2; examining attorney's

brief, p. 2.  Moreover, there is sufficient information to

indicate that federally-recognized tribes are entities or

juristic persons that can enter into contracts, sue and be sued.  See the Tiller Research publication.  We find that each federally recognized Apache tribe is necessarily either a juristic person or an institution.  Therefore, if APACHE would be viewed as suggesting a connection with these persons or institutions, whether the nine tribes are considered individually or collectively, when the designation is used on or in connection with the identified goods, and if such suggestion would be false, then refusal of registration under Section 2(a) is warranted.

We turn, then, to the elements of a Section 2(a) false suggestion of connection refusal.  As a preliminary matter, we note that published precedents from our primary reviewing court are few in number.  Some 30-35 years ago, the Court of Customs and Patent Appeals considered a Section 2(a) false suggestion claim, at least when brought by commercial plaintiffs, to be akin to a Section 2(d) likelihood of confusion claim.  See, e.g., Frederick Gash, Inc. v. Mayo Clinic, 461 F.2d 1395, 174 USPQ 151, 152 (CCPA 1972) ("the inquiry under this provision of the statute is similar to that under § 2(d), 15 U.S.C. 1052(d), which is likelihood of confusion of the marks as applied to the respective goods and/or services"); and Morehouse Mfg. Corp. v. J. Strickland & Co., 407 F.2d 881, 160 USPQ 715,

721 ("we do not agree with the further argument that 'Blue Magic' does 'falsely suggest a connection with' appellant. To do this there would have to exist, at the very least, the same likelihood of confusion with appellant's 'MAGIC' marks, under section 2(d), which appellant contends for under its final point.  We can therefore discuss these two questions together.").

It was not until approximately 10 years after the Frederick Gash decision that the Federal Circuit issued its seminal decision in the Notre Dame case.  In that decision, the Federal Circuit noted that the Board, subsequent to Morehouse, approached Section 2(a) false suggestion cases as if they required, in essence, a showing of likelihood of confusion under Section 2(d) plus a showing of intent to trade upon the goodwill of a prior user, which was termed a "stringent test."  Notre Dame, 217 USPQ at 507-08. The Notre Dame decision then laid down certain foundational principles for current Section 2(a) analysis:  that Section 2(a) was intended by its drafters to preclude registration of a mark which conflicts with another's rights, even if such rights were not technical trademark or trade name rights that could be the basis for a Section 2(d) claim; that a name cannot, however, be protected in gross; that protection from false suggestion under Section 2(a) has its

13

roots in rights of privacy and publicity, i.e., a right to control use of one's identity; that the name or an equivalent thereof claimed to be appropriated must be unmistakably associated with a particular personality or "persona"; and that given the context or circumstances of use, the name must point uniquely to the other personality or persona.  Id. at 508-09.

Since Notre Dame, the Board has had occasion to develop a fairly standard analysis under Section 2(a). It has been said that there are four elements:  1) that the mark is the same as, or a close approximation of, the name or identity previously used by another person or institution; (2) the mark would be recognized as such, in that it points uniquely and unmistakably to that person or institution; (3) the person or institution named by the mark is not connected with the activities performed by applicant under the mark; and (4) the fame or reputation of the person or institution is such that, when the mark is used with the applicant's goods or services, a connection with the person or institution would be presumed.  See, In re Wielinski, 49 USPQ2d 1754 (TTAB 1998) *overruled* only as to Section 2(e)(1) analysis in In re WNBA Enterprises LLC, 70 USPQ2d 1153 (TTAB 2003); TMEP Section 1203.03(e) (3rd ed., rev. 2, May 2003); and J. McCarthy, McCarthy on

14

Trademarks and Unfair Competition, § 19.76 (4th ed. 2001). The refusal has also been discussed as requiring three elements. See Urbano, 51 USPQ2d at 1778, and NAFTA, 43 USPQ2d at 1284.[7]

Returning to the Notre Dame case, we note that "the initial and critical requirement is that the name (or an equivalent thereof) claimed to be appropriated by another must be unmistakably associated with a particular personality or persona. Notre Dame, 217 USPQ at 509. Of course, Notre Dame was an inter partes proceeding, which accounts for the reference to "the name (or an equivalent thereof) claimed to be appropriated." In an ex parte proceeding, on the other hand, we are concerned not with that claimed by a plaintiff to have been appropriated, but with that which an applicant seeks to register as a mark and which the examining attorney asserts is the name, or equivalent thereof, of another. Nonetheless, it remains critical that the matter for which registration is sought must be the name or an equivalent which is sought to be appropriated by the applicant.

In NAFTA, the Board held that the mere fact that the applicant had added matter to that which was the name of an

---

[7] When viewed as a three-element test, the first and second elements of the four-element test essentially are viewed as one.

institution would not allow applicant to avoid the refusal. NAFTA, 43 USPQ2d at 1285. In this case, we reject applicant's contention that because none of the federally-recognized Apache tribes goes by the name APACHE alone and each has one or more other terms in its name, APACHE per se cannot be found to be the name or equivalent thereof of these tribes. Just as an applicant cannot take another's name and add matter to it to avoid a refusal of false suggestion under Section 2(a), an applicant cannot take a significant element of the name of another and avoid a refusal by leaving one or more elements behind, provided that that which has been taken still would be unmistakably associated with the other person.

Applicant contends that the other elements of the names of the federally recognized Apache tribes are significant in their own right and it would be error, in essence, to elevate the significance of Apache over the other terms. A Section 2(a) false suggestion case does not involve anything like the analysis of the elements of the names of these tribes as would be involved if this were a Section 2(d) case involving a question of likelihood of confusion. Wielinksi, 49 USPQ2d at 1757 ("Section 2(a) … is not about likelihood of confusion with trademarks. That problem is covered by Section 2(d) of the Act."). This

16

case does not require analysis of the tribes' names to divine which terms may be dominant. Suffice it to say that the Tiller Research reference work reveals that the geographic terms in many of the tribes' names, e.g., Fort McDowell, Fort Sill, and White Mountain, may not be as integral to the identity or persona of each tribe, when these terms may merely reflect locations the tribes were relocated to by government action, rather than choice, and there is nothing to indicate that the tribes themselves established "forts."

Finally, we reject applicant's contention that a finding that APACHE is a name or designation of the identity of each of the nine tribes somehow denigrates or minimizes other names or aspects of their identities. Nothing under Section 2(a) false suggestion analysis precludes a finding that APACHE is a name or identity for each tribe even though there may be other names or identities, customs or practices that the tribes do not have in common.

Having determined that the federally-recognized Apache tribes are persons or institutions for the purpose of our Section 2(a) analysis, and having determined that APACHE would be recognized as a name, or equivalent thereof, for each of the tribes, we turn to the question whether the

name is uniquely associated with the tribes.[8]  In support of her contention that APACHE is not uniquely and unmistakably associated with the tribes, applicant relies in part on dictionary definitions of "apache" and "Apache."  The fact that the former word begins with a lower case letter "a" and the latter begins with an upper case letter "A" is significant.  The term "apache" with a lower case "a" is, apparently, a French term and is pronounced differently than "Apache."  Thus, while "apache" means "a member of the Parisian underworld" or "thug, ruffian" in French, there is no evidence of record that this meaning would be apparent to consumers of cigarettes in the United States.[9]

Applicant has also attempted to rely on the asserted existence of numerous third-party registrations or applications for APACHE, or for marks including that term,

---

[8] Because the Section 2(a) prohibition against registration of names which may falsely suggest a connection with persons or institutions reads in the plural, and because we find each of the Apache tribes to constitute a person or institution, we therefore disagree with applicant's contention that the examining attorney's refusal cannot be maintained unless APACHE is found to point uniquely to only one of the tribes.

[9] In addition, the dictionary definition of "apache" submitted by applicant shows that the French term is "from Apache, Apache Indian."  Therefore, this definition does not show that the term has historically had a variety of meanings but, rather, actually tends to show that term has historically been associated with certain Native American tribes.

as well as one asserted use of the term for helicopters,[10] to establish that APACHE does not point uniquely and unmistakably to the Apache tribes but instead points to many registrants, applicants or users. Because applicant failed to make this evidence regarding registrations and applications properly of record, but for information regarding two pending applications, the contention is mere unsupported argument and we accord it little weight.[11]

The two applications for which applicant has properly put information into the record do not persuade us that consumers of cigarettes would not view APACHE as uniquely associated with the Apache tribes. Both applications are based on intent-to-use and there is no evidence of use of the term by either applicant for the goods identified in the applicants' respective applications. Applicant has pointed to no authority holding that third-party

---

[10] Applicant did not offer any evidence to support the assertion, although the Tiller Research publication entered by the examining attorney contains a passing reference to APACHE helicopters, as made by McDonnell-Douglas Company utilizing parts made by the White Mountain Apache Tribe's Apache Aerospace Company.

[11] The examining attorney, during examination, had included a lengthy discussion of why the "federal trust obligation" should lead us to discount any evidence of third-party registrations, apparently on the theory that any prior registrations of APACHE may have issued improvidently or contrary to the trust obligation. However, the examining attorney apparently confirmed for applicant, during an interview with counsel, that she was withdrawing any reliance on this doctrine. The doctrine has played no part in our decision. See Harjo, 50 USPQ2d at 1712-13.

registrations and applications should be given a prominent
role in our analysis of a Section 2(a) false suggestion
refusal, but that is a question to be decided in a case
that presents such evidence. In this case, we do not see
how the mere fact that APACHE is the mark in two intent-to-
use applications should be considered persuasive evidence
that a term historically associated with certain Native
Americans should now be considered to have other
associations and cannot, therefore be unmistakably
associated with the Apache tribes.

The next factor to consider is whether there is any
connection between applicant, and the goods she plans to
market under the APACHE mark, and the Apache tribes. The
record reveals that there is not.

The last factor we must consider is whether the name
APACHE is of sufficient fame or reputation that a
connection with the federally recognized Apache tribes
would be presumed by consumers of cigarettes. We caution,
however, that the inquiry here is not focused on
determining whether the APACHE name would qualify as famous
under traditional likelihood of confusion analysis or as
famous under evolving dilution analysis. Indeed, the Notre
Dame case does not explicitly state that a name must be
famous to be protected under Section 2(a). In fact, as

noted in <u>Notre Dame</u>, the fame of the name of a person or institution is not sufficient in and of itself to provide the basis for protection of the name under Section 2(a) false suggestion analysis. <u>Notre Dame</u>, 217 USPQ at 509. Rather, the key is whether the name per se is unmistakably associated with a particular person or institution and, *as used* would point uniquely to the person or institution. In short, it is the combination of (1) the name of sufficient fame or reputation and (2) its use on or in connection with particular goods or services, that would point consumers of the goods or services uniquely to a particular person or institution.

In this case, the examining attorney contends that the federally recognized Apache tribes are persons or institutions of such renown that the first part of the inquiry is satisfied. We find significant support in the record for this conclusion.

Applicant and the examining attorney agree that there are Apache tribes in three southwestern states. The name Apache is readily found in dictionaries and in such listings identifies Native Americans of this region. An <u>Albuquerque Journal</u> article, retrieved from the newspaper's web site, discusses the Mescalero Apache casino and travel center, skiing facility and a 275-room inn under

construction, on a major New Mexico interstate.  The tribe's chief operating officer explains that the tribe will compete nationally with resorts and will seek out-of-state as well as New Mexico visitors.

The Tiller Research publication discusses numerous enterprises of various Apache tribes that would contribute to the fame and reputation of the tribes:

The Camp Verde Yavapai-Apache Reservation is home of two successful smoke shops; and its Yavapai-Apache Visitor Activity Complex on a major interstate in Arizona includes, inter alia, a U.S. Park Service Office, arts and crafts shops, and a hotel.

The White Mountain Apache of the Fort Apache Reservation run the Fort Apache Timber Company, which employs 350 people, Apache Materials (a construction materials enterprise), the Apache Aerospace Company, a ski resort reported to feature Arizona's most sophisticated snow making, and numerous resort areas on various lakes. The tribe owns Old Fort Apache, listed on the National Register of Historic Places, runs a museum, a hotel, and hosts various festivals throughout the year, some focused on Native American culture and others focused on frontier culture or music, such as bluegrass.

The Fort McDowell Mohave-Apache Indian Community runs Ba'ja Bingo, with hundreds of video-gaming machines.

The Tonto Apache tribe in Arizona has a reservation "ideally situated to take advantage of the high volume of tourism" around Payson, Arizona and the Tonto National Forest, and runs a casino, smokeshop and market.

The Jicarilla Apache tribe of New Mexico operates significant mineral, gas and oil operations, and, excluding the U.S. government, is the single largest owner of mineral resources in the "resource rich San Juan Basin." Its reservation contains major archeological sites (cliff dwellings), a tribe-owned Best Western Inn, a shopping center and other facilities for visitors.

The Mescalero Apaches (discussed above in regard to the Albuquerque Journal's article on its casino and travel center expansion project) host a large industrial site, including a metal fabricating plant, and a forest products processing plant that processes lumber for sale throughout the southwest.

The Apache tribe of Anadarko, Oklahoma is host of the American Indian Hall of Fame, a bingo hall, smoke shop, gift shop and trading post.

The Fort Sill Apache tribe of Apache, Oklahoma, descendants of the Chief Geronimo Band of Apache, have the

historically significant Fort Sill Military Reservation on tribal land.

All of this convinces us that the Apache tribes of the southwest are of sufficient renown for their business, tourism, archeological and cultural enterprises that they would be well-known among residents of the southwestern U.S. and visitors to those areas.

Our final inquiry, then, is whether consumers of cigarettes would think only of the well-known Apache tribes when the name APACHE is used on or in connection with cigarettes. In this regard, the record is quite clear that many Native American tribes, Apaches and others, run smoke shops, many including Internet sales among their operations.[12] In addition, the record is clear that Native Americans not only are engaged in large-scale marketing of cigarettes, but in manufacturing of Native American brands of cigarettes. Applicant, for one, states that she is a

---

[12] As applicant acknowledges, the proliferation of cigarette and tobacco retailing outlets, whether "bricks and mortar" or Internet businesses, on Native American lands is likely a function of tax laws. See, e.g., the Forbes (online) magazine article attached to the examining attorney's final refusal, which discusses how tribes are retailing cigarettes, liquor and gasoline free of state and local taxes. See also, the www.indiancountry.com article "Smoking in Indian Country is Big Business," and www.manhattan-institute.org (Financial Times.com or FT.com) with its article on Internet sales of cigarettes increasing as a way for smokers to avoid taxes, and notes many such vendors are Native American tribes.

member of the St. Regis Mohawk tribe, which is in the business of manufacturing cigarettes, through its licensee Native Trading Associates, for resale on Native American reservations. Moreover, many of the web pages introduced by the examining attorney reveal marketing of Native American brands of cigarettes, as discussed below.

One web page shows a national map of cigarette retailers located on Native American reservations, with a banner ad at the top for cigarettenetwork.com which touts "Huge Savings on Native American & Major Brands," and the listing for the Omaha Reservation includes the "Tobacco Row Processing Company"; the web page for Indian cigarettes online includes, in its list of links "Indian cigarettes," as differentiated from "generic brands" and "major brands" etc., and has a listing for a SenecaSmokes shop which says "Be sure to try our Seneca cigarettes…"; the Smoker's Choice outlet specializes in heavily discounted brands and touts "our featured products, produced by the US Indian Nations are additive-free, tax-free & exceptionally well-priced"; the web page for Indian Smokes Online features many brands including "our very own Native brand cigarettes. These native brand cigarettes such as Seneca, Niagara's, Smokin Joes, Exacts, Markets, Lewistons are all made on our reservations."; and the www.indiancountry.com

article on the merger of two Native American online ventures, one of which is AllNative.com and is reported to have "started more than a year ago with sales of American Indian cigarettes, teas and coffee."

In short, cigarette consumers would be aware of Native American manufacturing and marketing of Native American brand cigarettes, and, given the fame of the name of the Apache tribes, would think uniquely of those persons or institutions when they see APACHE as a mark used on or in connection with cigarettes.

The examining attorney, in her final refusal of registration, and in particular in a discussion of federal trust obligation, asked that we resolve doubt in favor of protecting the APACHE name. As we have not placed any reliance on the federal trust obligation in reaching our decision, we do not resolve doubt in favor of the federally recognized Apache tribes on this basis. In fact, were there any doubt in this case, we would resolve it in favor of applicant. See In re In Over Our Heads Inc., 16 USPQ2d 1654-55. However, we have no doubt that the record supports refusal of registration of APACHE as a mark for cigarettes because use of the name of the federally recognized Apache tribes would falsely suggest a connection between applicant and those persons or institutions.

Decision: The refusal of registration under Section 2(a) is affirmed.