Mailed:
June 19, 2009

This Opinion Is a Precedent
of the TTAB

**UNITED STATES PATENT AND TRADEMARK OFFICE**

————

**Trademark Trial and Appeal Board**

————

In re Petroglyph Games, Inc.

————

Serial No. 78806413

————

Steven A. Gibson and Jodi Donetta Lowry of Gibson Lowry Burriss LLP for Petroglyph Games, Inc.

Khanh M. Le, Trademark Examining Attorney, Law Office 113 (Odette Bonnet, Managing Attorney).

————

Before Hairston, Rogers and Wellington, Administrative Trademark Judges.

Opinion by Rogers, Administrative Trademark Judge:

Petroglyph Games, Inc. (applicant) applied to register BATTLECAM, in standard character form, on the Principal Register as a mark for "computer game software." The mark in this intent to use application was approved for publication without issuance of an Office action. After applicant received a notice of allowance, it filed a statement of use. The application now lists February 16, 2007 as the date of first use of the mark and first use of the mark in commerce.

The examining attorney has made final a refusal of registration under Section 2(e)(1) of the Trademark Act, 15 U.S.C. § 1052(e)(1), on the basis that the proposed mark is merely descriptive of a feature of applicant's goods.  In addition, the examining attorney has made final a requirement for amendment of the identification of goods because the specimen of use is said to show that BATTLECAM is used by applicant to refer to a feature of its software, rather than as the name of its computer game.  The specimen appears below.



Before discussing the issues on appeal we must address an evidentiary issue, specifically, applicant's submission of evidence after the filing of its notice of appeal.  In its appeal brief, applicant requested that we take judicial notice of attached reprints of dictionary definitions for the word "camera," retrieved from the website Dictionary.com.  With its reply brief, applicant submitted numerous exhibits, including the results from various searches of the Internet for evidence to rebut prior submissions from the examining attorney.  Applicant requests that the attachments to its reply brief be considered because they "are an elaboration of the Exhibits presented by the Examining Attorney during the Mark's prosecution."  Reply brief, p. 13.  Applicant contends that its evidence should be considered because it did not have an opportunity to respond to the exhibits attached to the examining attorney's Office action finally refusing registration.  Id.  In addition, applicant contends many of its submissions are from the "same or similar sources used by the Examining Attorney."  Id.  In the alternative, applicant contends that the Board should consider suspending the appeal and remanding the application to the examining attorney for consideration of this new evidence.

We grant applicant's unopposed request, set forth in its main brief, that we take judicial notice of the definitions of "camera."[1] In contrast, we deny applicant's request that we consider the manifestly untimely submissions included with its reply brief. *See* Trademark Rule 2.142(d), *In re Fiesta Palms LLC*, 85 USPQ2d 1360 (TTAB 2007) ("Applicant relies for support for this example on an entry in an online encyclopedia, which it submitted with its reply brief. The submission is untimely and therefore is not properly of record. 37 CFR §2.142(d)."), and *In re Zanova Inc.*, 59 USPQ2d 1300, 1302 (TTAB 2001) ("By attempting to introduce evidence with its reply brief, applicant has effectively shielded this material from review and response by the Examining Attorney."). Applicant is incorrect in its statement that it did not have an opportunity to provide its submissions in response to the examining attorney's final Office action. Applicant could have filed a request for reconsideration with its notice of appeal, or at any time within six months of the

---

[1] During an appeal, the Board may take judicial notice of dictionary definitions retrieved from online sources when the definitions themselves are derived from dictionaries that exist in printed form. *See In re Red Bull GmbH*, 78 USPQ2d 1375, 1378 (TTAB 2006). Applicant's definitions of "camera," retrieved from the website Dictionary.com, meet this requirement because they are from The Random House Unabridged Dictionary. *See also In re IP Carrier Consulting Group*, 84 USPQ2d 1028, 1030 n.4 (TTAB 2007).

date of issuance of the final refusal of registration.  *See*

TBMP Section 1204 (2d ed. Rev. 2004).  In addition, even

after the time for requesting reconsideration had passed,

applicant could have, in lieu of filing its brief, filed a

request to suspend the appeal and remand the application

file for consideration of new evidence.  *See* TBMP Section

1207.02.  It is of no significance that the types of

evidence applicant submitted may be considered related to,

or from "the same or similar sources" as, the evidence

previously submitted by the examining attorney.[2]  That only

illustrates why it would not have been difficult for

applicant to gather this evidence at an earlier time and

submit it with a request for reconsideration or remand.

Finally, we deny applicant's alternative request for

remand, for failure to show good cause for a remand so late

in the appeal.  *In re Zanova Inc.*, supra, 59 USPQ2d at

1302.

***The Identification Requirement***

We consider first the examining attorney's requirement

for applicant to provide an amended identification, because

---

[2] This is not an instance where applicant is attempting to
introduce the entirety of articles for which the examining
attorney had introduced only excerpts, to provide context.
Rather, applicant is attempting to introduce different web pages
than those which the examining attorney introduced, in an attempt
to rebut the examining attorney's evidence.

we believe it helpful to consider this prior to determining whether the proposed mark is descriptive. Applicant has argued that it "is not willing to concede descriptiveness by acceding to the need to claim that the Mark is a feature of the goods." Response of February 29, 2008, p. 7 (hereafter, "Response"). Further, applicant argues in its response and in its appeal briefs that the identification "computer game software" is specific, definite, would be clear to the average person and otherwise meets the Office's requirements for identifications of goods. We agree that it meets those requirements. *See In re Paper Doll Promotions, Inc.*, 84 USPQ2d 1660 (TTAB 2007). However, the examining attorney has not required a more specific identification because the given identification fails to meet Office requirements regarding clarity or specificity. Rather, the examining attorney contends the given identification is not accurate and is "at variance with" what the specimens show the goods to be. Brief, p. 5.

The Office's requirement that the examining attorney ensure the accuracy of the identification of goods is abundantly clear. *See* TMEP Section 1402.01 ("The identification of goods or services must be specific, definite, clear, **accurate**, and concise"; "The **accuracy** of

the identification language in the original application is important because the identification cannot later be expanded"), and Section 1402.01(e) ("the examining attorney may require amendment of the identification of goods or services to ensure that it is clear and **accurate**") (emphasis added). The responsibility that the examining attorney ensure accuracy of the identification exists notwithstanding that TMEP Section 1402.03(d) ("Identifying Computer Programs with Specificity") notes that "computer game software" is an acceptable identification, for TMEP Section 1402.04 explains that "even if the identification is definite, examining attorneys may inquire as to whether the identification chosen accurately describes the applicant's goods or services." Finally, *see* TMEP Section 1402.05, "Accuracy of Identification" and decisions discussed therein.

In the case at hand, applicant's Statement of Use refers to its specimens as a "screen capture of video game utilizing BATTLECAM **feature**" (see June 15, 2007 statement of use) (emphasis added). In particular, as shown by the specimen reproduced supra, the "screen capture" bears the game title "STAR WARS EMPIRE AT WAR" and includes, within a control panel at the bottom of the screen, a small icon

7

that appears to be a film industry "clapper board,"[3] with an adjacent dialog box that reads "BATTLECAM[TM]" and has a pointer that points to the clapper board icon. Any viewer of the content of this screen would not perceive BATTLECAM to be the name of the game. STAR WARS EMPIRE AT WAR would be perceived as the name of the game, and BATTLECAM would be perceived as the name of a specific feature or aspect of the STAR WARS game that is accessed or activated by clicking on the icon to which the BATTLECAM dialog box points. As the examining attorney stated in the Office's appeal brief (at p. 5), "The name of the computer game software is 'STAR WARS EMPIRE AT WAR' as opposed to the mark 'BATTLECAM,'" and applicant in its reply brief did not contest the assertion that STAR WARS EMPIRE AT WAR is the name of its game.[4]

---

[3] We take judicial notice that "clapper boards" are defined as "a pair of boards hinged at one end and banged together in front of a motion-picture camera before or after a take to facilitate synchronization of sound and picture prints." Webster's Third New International Dictionary p. 415 (1993). The Board may take judicial notice of dictionary definitions. *University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co.*, 213 USPQ 594 (TTAB 1982), aff'd, 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

[4] Further evidence of the name of applicant's game is contained in a web page excerpt attached to the examining attorney's Office action of April 1, 2008, which excerpt refers to "Petroglyph, makers of Star Wars: Empire at War." The web page corroborates a fact shown by applicant's specimen and not denied by applicant, i.e., that the name of the game from which the specimen is derived is STAR WARS EMPIRE AT WAR, not BATTLECAM.

While a product may be identified by more than one trademark, applicant does not specifically argue that BATTLECAM is a second trademark for its STAR WARS game. Applicant, however, alludes to that possibility in its brief (at p. 12), when it asserts "Nothing in TMEP §1402.01 mandates or suggests that only marks constituting the actual title of software may be described as 'computer game software.'"  We construe this as a statement that a producer of computer game software can utilize terms other than the name or title of a game as a trademark for such a game, and we acknowledge the possibility.  For example, used in the proper manner, applicant's corporate name Petroglyph Games could serve as a mark for its computer games, even though it would not be the name of any specific game.  Acknowledging, however, the possibility that more than one mark may be used for a product, begs the question presented by the examining attorney's requirement for an amended identification.  That question is whether BATTLECAM is being used as a mark for "computer game software" or only for a feature of a computer game, and whether, if the latter, the present identification is inaccurate.

We conclude that the present identification is not unacceptable as inaccurate.  Even accepting for the sake of argument that BATTLECAM only identifies for players of

9

applicant's computer games a feature of such games, the feature remains, at bottom, computer code that allows the feature to be activated and used by or controlled by a player. Based on our consideration overall of applicant's discussion of its software and of the examining attorney's compiled reviews and discussions of various games, it is clear that computer game software necessarily must involve a good deal of computer code to support the video, audio, and interactive features of such games. Certainly the entire collection of code used for a particular game can aptly be referred to as "computer game software"; but we conclude that subsets of such code that would support only particular aspects or features of a game can also be accurately identified by such an identification. *See In re Sun Microsystems Inc.*, 59 USPQ2d 1084 (TTAB 2001) (AGENTBEANS refused as descriptive of "computer software for use in the development and deployment of application programs on a global computer network" in part based on evidence that "beans" are building blocks used to create larger pieces of software).

While there can be no doubt that there is a market for selling or distributing to computer game players all the software that allows a game to be played in its entirety, there may also be a market for computer game software

related to only certain game features, perhaps among game developers or producers who might want to include a particular feature in a complete game, or perhaps among players seeking after-market add-ons or enhancements for existing games. Although it may be more precise to identify game feature software by the identification suggested by the examining attorney, "a feature of computer game software that allows users to _____ (specify function)," it would not be inaccurate to identify such software simply as computer game software. The examining attorney has not established that Office identification policies require either that "computer game software" only be used for software that comprises an entire game, or that the suggested, more specific language is required when computer game software comprises less than an entire game.

The examining attorney has only argued that the identification is "inconsistent" or "at variance" with the specimen, arguments with which we disagree, and has not argued or explained why the identification should be considered overbroad. Therefore, we cannot conclude that the identification is unacceptable on that basis, even if that was the intended basis of the requirement for a narrower identification. Moreover, we find the two cases which the examining attorney cites in support of the

requirement to be distinguishable on their facts from the case at hand.

We therefore reverse the examining attorney's requirement that applicant amend its identification of goods to employ more specific language. On the other hand, we affirm the refusal to register the proposed mark on the basis that it will be perceived by prospective consumers as merely descriptive of applicant's computer game software, for reasons detailed below.

### The Descriptiveness Refusal

A mark is merely descriptive if it immediately describes the ingredients, qualities, or characteristics of the goods or services or if it conveys information regarding a function, purpose, or use of the goods or services. *In re Abcor Development Corp.*, 588 F.2d 811, 200 USPQ 215, 217 (CCPA 1978). *See also In re MBNA America Bank N.A.*, 340 F.3d 1328, 67 USPQ2d 1778, 1780 (Fed. Cir. 2003) (A "mark is merely descriptive if the ultimate consumers immediately associate it with a quality or characteristic of the product or service"), and *In re Nett Designs*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001). To be merely descriptive, a term need only describe a single significant quality or property of the goods. *In re Gyulay*, 820 F.2d 1216, 3 USPQ2d 1009, 1009

12

(Fed. Cir. 1987); *Meehanite Metal Corp. v. International Nickel Co.*, 262 F.2d 806, 120 USPQ 293, 294 (CCPA 1959).

Applicant contends, "The coined word BATTLECAM contains no references to computers, or games, or software." Response, p. 2. See also, Reply brief, p. 8. Descriptiveness, however, is not analyzed by considering the mark in the abstract but in conjunction with the identified goods, for it is settled that "[t]he question is not whether someone presented with only the mark could guess what the goods or services are. Rather, the question is whether someone who knows what the goods and services are will understand the mark to convey information about them." *In re Tower Tech Inc.*, 64 USPQ2d 1314, 1316-17 (TTAB 2002). *See also In re Home Builders Association of Greenville,* 18 USPQ2d 1313 (TTAB 1990)*;* and *In re American Greetings Corporation*, 226 USPQ 365 (TTAB 1985).

First, we examine the evidence concerning the meanings that would be ascribed to the term BATTLECAM and the separate terms BATTLE and CAM,[5] when used with applicant's goods. Although applicant argues that the examining attorney's consideration of the two distinct elements of the proposed mark constitutes an impermissible dissection

---

[5] Applicant does not argue BATTLECAM would be perceived as a combination of terms other than BATTLE and CAM.

of the mark, Brief, pp. 3 and 5, it is entirely acceptable to consider the component parts of a composite mark when divining the likely perception of the composite. *See, e.g., In re Zanova Inc.*, supra (ITOOL would be perceived as short for "internet tools" and was refused as descriptive for goods and services including software for creating Web pages), *In re Polo International Inc.*, 51 USPQ2d 1061 (TTAB 1999) (DOC-CONTROL refused as merely descriptive of document management software), and *In re Pennzoil Products Co.*, 20 USPQ2d 1753 (TTAB 1991) (MULTI-VIS refused as merely descriptive of multiple viscosity motor oil). *See also, In re King Koil Licensing Co.*, 79 USPQ2d 1048 (TTAB 2006) ("Nor has the examining attorney engaged in impermissible dissection of a mark by determining that one term in the mark is descriptive and another generic. This is all part and parcel of routine examination of a multiword mark.").

Both the examining attorney and applicant have made of record dictionary definitions for the term "battle," which are essentially the same. We therefore defer to the definitions submitted by applicant. These define "battle" as meaning "a hostile encounter or engagement between opposing military forces," "participation in such hostile encounters or engagements," "a fight between two persons or

14

animals," "any conflict or struggle," "to engage in battle," and "to work very hard or struggle; strive."[6] Response, exhibit 3. Clearly, "battle" is descriptive of computer games that feature battles as part of the game play, and it could not reasonably be argued that a game titled STAR WARS EMPIRE AT WAR would not feature battles or combat of some type. Indeed, we would have to consider whether the mark was deceptively misdescriptive if a game so titled did not include any battles.

Applicant argues that although "computer games may involve simulations of some form of contest including a battle of sorts, there is nothing intrinsic or inherent in computer games having either contests, battles or the like," Response, p. 4, and that the scope of its identification "makes no reference to the type of computer game software services [sic] provided under the Mark." Response, p. 5. See also, applicant's brief, at p. 8: "While a subset of computer games involve simulations of contests, wars, or 'battles,' the word battle by no means describes the entire universe of 'computer game software.'" Applicant never actually denies, nor could it, that the particular computer game illustrated by its specimen does

[6] There are others, but these are sufficient to illustrate the types of definitions of record.

15

feature battles.  More importantly, just as a term need not describe all aspects of a product for it properly to be refused as descriptive, a term need not describe every type or variation of a product listed in an identification for the term to be merely descriptive.  It is sufficient that it merely describe a type of product that is within the scope of the identification.  "Station wagon," "sedan," "coupe," and "convertible," for example, each would be a descriptive term if listed as the subject of an application whose identification read "automobiles," even though none would itself describe all types of automobiles.  "[A] mark may be merely descriptive even if it does not describe the 'full scope and extent' of the applicant's goods or services."  *See In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1173, 71 USPQ2d 1370, 1371 (Fed. Cir. 2004) (quoting *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1346, 57 USPQ2d 1807, 1812 (Fed. Cir. 2001)).  Thus, even if applicant uses BATTLECAM in conjunction with computer games that do not include battles, "battle" remains a descriptive term for those that do; and applicant's identification does not exclude games featuring battles, so we must assume that the identification includes such games.[7]

---

[7] As noted above, an identification specifically excluding games featuring battles would make the mark deceptively misdescriptive.

16

Turning to the CAM portion of the proposed mark, applicant argues that it is a term most likely to be perceived as the acronym for "Computer-Aided-Manufacturing" or as a shortened version of "camshaft" and, if the latter, likely to have the meaning of "an eccentric or multiply curved wheel mounted on a rotating shaft, used to produce variable or reciprocating motion." See Response, exhibit 2 (results of a web search for "cam definition"). We note, however, that attached to the same response (exhibit 4) are the results of applicant's search for entries for CAM at Dictionary.com; and these listings begin with "sponsored links" offering the web searcher links to "Webcams" from www.Dell.com/SmallBusiness and "Web-cams" from Amazon.com.[8]

In addition, both applicant and the examining attorney conducted searches for CAM in the abbreviations and acronyms database of acronymfinder.com, with both turning up the same first 15 results. Among these, the first listing is for "camera" and fourth is for "camcorder (video source)." Also, included with the final refusal of registration are the results of the examining attorney's search for "cam" in the Merriam-Webster OnLine Dictionary,

---

[8] Since neither sponsored link includes an explanation of what a webcam is or what it does, it appears clear that the sponsors of the links believe that "webcam" is a term that will be immediately understood.

which returned six entries, with the second being "Main

Entry: **cam**  Function: noun  Date: 1977 : camera;

especially: Video Camera."

Supplementing the above evidence, we take judicial

notice of the following definitions from various

dictionaries and encyclopedias (bold-face and italics in

original entries):

> **camcorder** (n.) Contraction of *camera* and
> *recorder*; portable videotaping gear.  The usual
> formats are VHS and 8 mm, along with their
> higher-resolution versions, S-VHS and Hi-8.  VHS-
> Compact 9VHS-C) is a smaller version of VHS.  The
> Dictionary of Multimedia Terms & Acronyms p. 45
> (1999).

> **camcorder** n. a portable combined video
> camera and video recorder – Origin 1980s: blend
> of camera and recorder.  The New Oxford American
> Dictionary p. 247 (2001).

> **Webcam** A videocamera, attached to the
> Internet, that uploads images to the Internet
> either at intervals or in realtime.  Popular
> webcam images have shown college dorm rooms or
> someone's driveway.  Imagine that!  Illustrated
> Computer Dictionary for Dummies (4th ed. 2000).

> **CAM** … (4) (**CAM**era) See also Webcam.  **WebCam**
> (**WEB CAM**era) A video camera that is used to send
> periodic images or continuous frames to a Web
> site for display.  WebCam software typically
> captures the images as JPEG or MPEG files and
> uploads them to the Web server.  There are
> countless WebCam sites throughout the Internet
> that have cameras pointed at virtually
> everything, including people just going about
> their daily work.  WebCams have become popular on
> sexual-oriented sites providing the electronic
> rendition of the live "peep show."  Computer

18

Desktop Encyclopedia, p. 109 and p. 1055 (9th ed. 2001).

**WebCam** (**WEB CAM**era) A video camera that is used to send periodic images or continuous frames to a Web site for display. There are countless WebCam sites throughout the Internet that have cameras pointed at virtually anything, including animals and people doing their daily work. The images are refreshed every minute or so. Live video feeds for continuous action may also be provided. The Computer Glossary p. 439 (9th ed. 2001).

The dictionary entries show that when "cam" is used in conjunction with another word providing appropriate context, it will readily be perceived as a shortened form of "camera." The question, then, is whether CAM, when it is employed by applicant as part of BATTLECAM, constitutes a use that, in context, will be perceived as a shortened form of "camera" or as a reference to Computer-Aided-Manufacturing, camshafts, or one of the other subjects listed in applicant's search results of the Internet and of Dictionary.com.

We conclude that CAM will be considered by players of computer games as a reference to a "camera," and more specifically, as a reference to the optional camera-like view or views of the terrain or scenes in a computer game that a player may access during play. We rely for our conclusion on this point both on the dictionary definitions

of camcorder and webcam, which show that there is a practice of using cam as a shortened form for the word camera, and on the various Internet game reviews and criticisms from players attached to the examining attorney's Office actions of August 29, 2007 and April 1, 2008, which we discuss further below. Applicant argues that its game software does not include even a "virtual" camera, and asserts that even if computer game players would view "cam" as short for "camera," these would still be only suggestive terms. The evidence, however, leads us to a contrary conclusion.

Relying on a definition of a "camera" (see exhibit to main brief) as a device that records and/or transmits "an image that *exists*," brief, p. 10 (emphasis by applicant), applicant argues that it is unclear what a camera in a computer game is photographing or who is operating the camera, "since the purported 'camera' is only providing a different view or perspective of virtual game activity." Id.[9] Applicant's argument implicitly acknowledges that

---

[9] Applicant argues that BATTLECAM cannot be descriptive of its goods because its goods do not capture and/or transmit visual data. See Response, p. 6, Brief, pp. 9-10. In contrast, an excerpt from the website http://joesguy.deviantart.com, which is referred to as journal and contains entries from various posters, includes one post that refers to pictures reportedly taken using the BATTLECAM feature of the Star Wars: Empire at War game ("Now, Battlecam is great for capturing screenshots of intensive battles.") As this is the only evidence offered by the examining

there is a function or feature in certain computer games that can be accessed by players to provide different views of the activity transpiring in the game. More significantly, evidence made of record by the examining attorney shows that computer game players use "camera" alone, as well as "battle camera" and "battlecam," and that they all signify a feature of a computer game that allows the player to select alternative views of the field of battle in a game.[10]  See the following excerpts made of record with the examining attorney's office actions refusing registration (underscoring added):

> "Product Features … Dynamic <u>battle camera</u> shows the action from multiple angles."  (From <u>Amazon.com</u> reviews of Suikoden IV game.  The same description also appears on the <u>ebay.com</u> website, in an auction for a copy of the game).

> "The one hang-up with the presentation of all this is relatively common among real-time strategies: <u>the camera</u>.  Battle for Middle-earth has two basic views: a 20,000-foot world view as players decide which territory to defend or attack next, and a close-in <u>camera</u> that [is] used during battle.  The world view is fine; as

attorney that runs counter to applicant's contention that its goods do not capture or transmit images, we acknowledge the entry but give it little weight.

[10] Applicant, in its reply brief, at p. 5, argues that the examining attorney's search for this evidence was biased because the examining attorney searched for uses of "battle camera" and "battle cam" in conjunction with video games.  We reject the contention because, as noted, the question of descriptiveness is to be determined not in the abstract but in conjunction with the identified goods.

expansive as Middle-earth may seem, it's really divided into four key areas, none of which requires out-of-sequence monitoring.  The battle camera, on the other hand, only allows players to zoom in, making it difficult to monitor every battle on the battlefield.  The game does include a "bookmark" option … but it doesn't quite make up for the fact that moving the camera between nearby areas can be a bit harrowing. … Camera snafu aside…."  (From review of the game LOTR: Battle for Middle-earth, www.dailygame.net).[11]

"Pros:  … I cant [sic] describe how fun it is to watch them destroy everything in theirs [sic] paths (especially through the battlecam).  Cons: … The camera is also a tad bit of a problem, it doesnt [sic] zoom nearly far enough so it makes it kinda hard to watch all the action when you have 3 Walkers on screen."  (From review of the game Universe at War: Earth Assault, on the www.newegg.com website).

"You will, however, notice the first time you go into battle.  Your required bleeding-shaky-battlecam fades into a beautiful landscape, with birds flying overhead, calling, and the sun glinting in your eyes."  (From review of the game Chrono Cross, on the www.gamevortex.com website).

"You've never had so much control in an RTS before as to the view and position of the camera. You can zoom WAY out getting a look at the entire battlefield, or zoom all the way and literally be at street level with your units watching the firefights take place. … I would have loved to see a dedicated 'battle cam' button when selecting a unit to get a great perspective on battles."  (From review of the game World in Conflict, on the www.evilavatar.com website).

"Each combat opportunity has been given the Hollywood look, with camera angles and fancy

---

[11] While the dailygame.net website review was retrieved by the examining attorney's search of August 21, 2007, the archived review itself is dated January 18, 2005, i.e., more than a year prior to the constructive first use date attributable to the filing date of applicant's intent-to-use application.

post-production effects that aren't the norm in video-game industry.  The battle camera is dynamic, too, which means you'll have several different views of the same scenario before a turn (either friendly or enemy) is put in motion.  Animations associated with the current turn are cleverly cued from these interesting camera angles as well, so, for instance, you might have roadie-style, worm's-eye view of an attack, with the added twist of the lens trailing the attacker."  (From review of the game Lost Odyssey, on the website http://previews.teamxbox.com).

"The overworld camera allows you to view 360 degrees around your party, while the battle camera can twist, turn, zoom in and out, and give the player multiple angles on the action during a fight. … A closeup of its face shows the flames coming out of its mouth, just before the camera cuts to a different angle which shows Ifrit blast through the enemies before it disappears."  (From a review of the game Final Fantasy VII, on the website www.gamesarefun.com).[12]

"The battle camera is also well done, and it zooms and swoops cinematically during critical hits and other pivotal attacks.  But in keeping with Blue Dragon's nothing-special sensibilities, free-roam environments are endlessly boring and often striking in their emptiness.  There are also a lot of blurry depth-of-field effects that make objects in the distance appear all fuzzy when the camera focuses on the foreground." (From a review of the game Blue Dragon, on the website http://reviews.cnet.com).

We need not cogitate over the etymology of the word camera, or its shortened form "cam," and determine whether it is logical for players of computer games to use

---

[12] The date of this review is July 15, 2005, i.e., prior to the filing date of applicant's application.

"camera," "battle camera" or "battle cam" to refer to a feature of such games that allows a player to view the field of battle or places within a game's terrain as one would if looking through a camera, or receiving a transmission from a camera. SPAM is a term long listed in dictionaries as "a trademark for spiced pork products." *See* The American Heritage Dictionary of the English Language p. 1237 (1976). Yet the term has also been adopted by computer users to refer to "unsolicited commercial bulk e-mail akin to 'junk mail' sent through the postal mail." *See Hotmail Corp. v. Van$ Money Pie Inc.*, 47 USPQ2d 1020 (N.D. Cal. 1998) (finding of fact no. 5). Words are adopted and used for various purposes, as the use of SPAM illustrates. It therefore does not help applicant overcome the instant refusal to argue that its computer game software does not include a feature that actually records images or transmits images, as a camera does. The fact remains that on the record created in this case, the function or feature within a game that allows a player to resort to alternative views of the playing field, elements thereof, or participants thereon, is referred to by players as a "camera," "battle camera" or "battlecam"; and the fact that such feature may not fit the dictionary definition of a camera is unimportant. *See In re Polo International*,

supra, 51 USPQ2d at 1063 (Board unpersuaded by applicant's arguments that public would perceive different nuances between the words "control" and "manage" in case where applicant's DOC-CONTROL software was used for "document management" not document control).

In its reply brief, at pages 5-6, applicant argues both that the examining attorney put in no evidence to allow the Board to determine what motivated game reviewers, or game players, to use the terms "battle camera" or "battle cam," and thus the excerpts should not be given a great deal of weight. In addition, applicant contends the excerpts made of record provide no proof the games actually included a "battle camera" feature. In support of the former point, applicant cites to *In re Federated Department Stores*, 3 USPQ2d 1541 (TTAB 1987). The case is not, however, analogous to the case at hand. In *Federated*, the Board appears to have discounted a single NEXIS excerpt because of the panel's inability to determine why a term was used in a headline for a story. This is entirely distinguishable from the case at hand, wherein the excerpts in question refer to "camera," "battle camera" or "battle cam" not in headlines but in narrative text, thus providing context for the uses. In addition, there are numerous excerpts, not a single excerpt of questionable weight. In

25

regard to applicant's latter point, i.e., the absence of evidence that the games being reviewed actually feature battle cameras, it is not likely that reviewers of games, or players discussing in online forums their experiences playing particular games, would discuss nonexistent features of such games. Nonetheless, the evidence is significant not because it proves what attributes the particular games possess, but because it shows that numerous players or reviewers chose to use the terms "camera," "battle camera" or "battle cam" in their descriptions of the games without need to explain such terms. Thus, the evidence indicates the terms are familiar, descriptive terms in the computer game field. Further, applicant admits that an "aspect of [its] computer game software" "provides an alternative view of on-screen movement." Reply brief, p. 10. It is this type of game feature that game players or reviewers refer to as a view provided by a "camera," "battle camera" or "battle cam."

Because there is sufficient dictionary and other evidence on which to conclude that BATTLE and CAM both would be viewed as descriptive terms when considered in conjunction with applicant's goods, and because the combination of the terms does not result in a composite that alters the meaning of either of the elements, refusal

26

on the ground of descriptiveness is appropriate. *See In re Gould Paper Corp.*, 834 F.2d 1017, 5 USPQ2d 1110, 1111 (Fed. Cir. 1987). *See also*, *In re Zanova*, supra, *In re Sun Microsystems*, supra, *In re Polo International*, supra, and *In re Pennzoil*, supra. Moreover, as discussed, the examining attorney has put into the record references illustrating use of the composite "battle cam." Applicant, in contrast, has put in the record evidence showing that its search of the Merriam-Webster Online dictionary (www.merriam-webster.com/dictionary) returned no results for its search for the term. Nonetheless, as shown above, the elements BATTLE and CAM have clearly descriptive meanings when used in conjunction with at least certain types of computer games that involve battles and include a feature providing the player with the option to utilize various views of the battlefield. Under these circumstances the absence of BATTLECAM from the dictionary applicant references does not dictate, as applicant contends, Brief, p. 6, that we find the term to be a fanciful mark, rather than a descriptive term. *See In re Gould*, supra; *In re Mine Safety Appliances Co.*, 66 USPQ2d 1694 (TTAB 2002) (WORKMASK found descriptive despite absence of any evidence composite appeared in dictionaries); and *In re Energy Products of Idaho*, 13

USPQ2d 2049, 2052 (TTAB 1989) ("The absence of [WASTE-TO-ENERGY] from the dictionary is not, contrary to applicant's argument, 'persuasive evidence' that the term is not merely descriptive of applicant's services."). *See also, Sweats Fashions Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 4 USPQ2d 1793, 1797 (Fed. Cir. 1987), where absence of term "sweats" from dictionary and fashion references was found insufficient to create genuine issue of fact precluding entry of summary judgment, "in the face of the strong evidence showing that 'sweats' is commonly used as a descriptive name for fleece garments, particularly sweatshirts and sweatpants."

We also disagree with applicant's contention that the combination of BATTLE and CAM results in a combination that is more than merely descriptive. Applicant essentially argues that the combination of BATTLE and CAM results in an incongruous composite, or one without an obvious meaning, because of the wide array of definitions for each. See Response, p. 3, "arguably the only relationship would be some form of entertainment between mechanics battling away at repairing cam shafts in a vehicle," and p. 5, "BATTLECAM might be descriptive or suggestive of a customized camshaft specifically designed for use by auto mechanics to obtain a competitive advantage in a racing or demolition derby

28

setting." As previously noted, however, the meaning of BATTLE, CAM and the composite BATTLECAM must be determined by considering the proposed mark in conjunction with the identified goods. From the perspective of a prospective purchaser or user of computer game software, the immediately apparent meaning of BATTLECAM will be that of a feature of a computer game, as such purchasers are not at all likely to think of battling car mechanics.

Applicant, although arguing that the composite is inventive and fanciful, does not specifically argue that its proposed mark creates any sort of double entendre. Nonetheless, to be complete in our analysis, we note that we see no double entendre resulting from the combination of the two merely descriptive terms. *See In re The Place Inc.*, 76 USPQ2d 1467, 1470 (TTAB 2005) ("The multiple interpretations that make an expression a 'double entendre' must be associations that the public would make fairly readily," quoting TMEP § 1213.05(c)).

In conclusion, we find that prospective purchasers or users of computer game software will have no need to pause or cogitate on the possible meaning of applicant's proposed mark, when considered in conjunction with computer game software. The evidence is clear that the use of "camcorder" and "webcam" at a minimum have conditioned even

the general public to view the "cam" element of composite words as likely to be a shortened version of the word camera.  Computer game players in particular, because of their involvement with computers, may be even more likely than members of the general public to be familiar with the term "webcam" and these individuals will therefore be even more predisposed to see "cam" as a short form for the word camera.  Finally, given the evidence of use of "camera," "battle camera" and "battlecam" in reviews and commentary on computer game features that allow a player to manipulate various views of a battlefield, we have no hesitation or doubt in concluding that the relevant class of purchasers will immediately understand BATTLECAM to describe a feature of computer game software.

Decision:  The requirement for an amended identification of goods is reversed.  The refusal of registration under Section 2(e)(1) is affirmed.